STATE OF NORTH DAKOTA EX REL. ANDREW MILLER, Attorney General, and Max Stern, Relator, v. WALTER C. TAYLOR, Commissioner of Insurance of the State of North Dakota, and as such Commissioner of Insurance, Gunder Olson, State Treasurer of the State of North Dakota, and as such Treasurer.

(145 N. W. 425.)

By chap. 194, Laws of 1913, entitled, "An Act Establishing a State Bonding Department in the Office of the Commissioner of Insurance, Providing for the Maintenance Thereof, and Creating a Reserve Therefor, Prescribing the Duties of Officers Connected Therewith, Providing for the Payment of Premiums and of Indemnities for Losses, and providing for the Disposal of the Surplus after

Such Reserve Has Been Created," it was attempted to establish a bonding department, to bond certain county, city, village, township, and school district officials at the expense of the subdivisions of which they are officials. It is held:

**Legislative power — delegation of — unwarranted — premiums — administration officers — bonding fund — payment of losses — payment of expenses — limitation — subdivisions — officials of.**

1. Following State ex rel. Rusk v. Budge, 14 N. D. 532 (the Capitol Commission Case), that said chap. 194 is invalid as an unwarranted delegation of legislative power to administrative officers, for the reason that said chapter provides for the payment of premiums by the subdivisions of the state, which premiums constitute a bonding fund, and it attempts to give to the commissioner of insurance the arbitrary power to determine how much of such fund shall be applied to the payment of losses, and how much to the payment of deputies, clerk hire, and other expenses of the department, and, particularly, because no limitation is placed upon the amount which may be devoted to the last-mentioned subject.

**Unwarranted delegation of judicial power — administrative officers — officials of subdivisions of state — bonds of.**

2. Following State ex rel. Standard Oil Co. v. Blaisdell, 22 N. D. 86, said chapter 194 is invalid as an unwarranted delegation of judicial power to purely administrative officials, in that it commits to the commissioner of insurance the sole right to determine the amount due subdivisions whose officials are insured, by reason of any default or violation of official duties, and also delegates to the auditing board the power to determine when bonds of insured officials shall be canceled, which are judicial functions.

**Invalidity — taking property without due process — commissioner of insurance — judge — jury — conflicting capacities.**

3. Said chapter 194 is also invalid because it provides for taking the property of counties, cities, and other subdivisions of the state without due process of law, in that it is an attempt to authorize the commissioner of insurance to determine the amount due to any such subdivision whose official it is claimed has defaulted, or been guilty of malfeasance in office, without notice to such subdivision, or any opportunity for a hearing on the subject, or any other provision for determining, by means of any channel for the administration of justice, any question of liability which may arise between the subdivisions and the bonding department. It is attempted to constitute the insurance commissioner the judge and the jury, as well as the custodian of the fund, and to impart to him the power to serve in these conflicting capacities.

Opinion filed December 29, 1913. Rehearing denied February 11, 1914.

Original application to this Court for the issuance of its writ prohibiting and enjoining the Commissioner of Insurance of the State from putting into effect the provisions of chap. 194, Laws of North Dakota for 1913, requiring him to establish a bonding department to go into operation on the 1st day of January, 1914.

Writ granted.

*Lawrence & Murphy* and *Pierce, Tenneson, & Cupler,* and *Bangs, Metcher, & Hamilton,* for plaintiffs.

It is clear that the state intended to engage in the business of furnishing bonds to counties and other subdivisions, to indemnify against loss by the default of public officials of such subdivisions. Laws of 1913, chap. 194.

Such act is in violation of § 185 of the Constitution of this state. It is also in violation of §§ 1 and 23 of our Constitution. Rippe v. Becker, 56 Minn. 100, 22 L.R.A. 857, 57 N. W. 331; Opinion of Justices, 155 Mass. 598, 15 L.R.A. 809, 30 N. E. 1142; Crawfordsville v. Braden, 130 Ind. 149, 14 L.R.A. 268, 30 Am. St. Rep. 214, 28 N. E. 849; McCullough v. Brown, 41 S. C. 220, 23 L.R.A. 410, 19 S. E. 458; 1 Bl. Com. 138; Re Jacobs, 98 N. Y. 98, 50 Am. Rep. 636; Cooley, Const. Lim. 4th ed. 719; Butchers' Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co. 111 U. S. 756, 28 L. ed. 590, 4 Sup. Ct. Rep. 652; George Bolln Co. v. North Platte Valley Irrig. Co. 19 Wyo. 542, 39 L.R.A.(N.S.) 868, 121 Pac. 22.

The law or bonding act under consideration is discriminating, in that it requires only certain county officials to furnish bond with the state as surety, permitting others to take such bonds at their option; permitting the state to withdraw from any bond, and refusing to become surety on any bond greater than a given amount. State ex rel. McKell v. Robins, 71 Ohio St. 273, 69 L.R.A. 427, 73 N. E. 470, 2 Ann. Cas. 485; George Bolln Co. v. North Platte Valley Irrig. Co. 19 Wyo. 542, 39 L.R.A.(N.S.) 868, 121 Pac. 22.

This act is also in violation of the Federal Constitution, in that it takes property without due process of law. Fed. Const. 14th Amend. § 1.

*Andrew Miller,* Attorney General, *John Carmody,* and *Alfred Zuger,* Assistant Attorneys General, for defendants.

There is no constitutional provision in this state requiring *any of-*

*ficer* to furnish bonds.    Those officers of whom bonds are required come
under the provisions of statute law.    Rev. Codes 1905, §§ 400–415,
and amendments.

In the absence of a constitutional provision, the legislature has the
right to prescribe qualifications for office, such as taking oath and giving
bond, etc.    29 Cyc. 1375.

The state Constitution is a limitation of power, and the legislature
has supreme power except where limited.    Cooley, Const. Lim. 7th ed.
242; Ensley Development Co. v. Powell, 147 Ala. 300, 40 So. 137;
Sheehan v. Scott, 145 Cal. 684, 79 Pac. 350; McGuire v. Chicago,
B. & Q. R. Co. 131 Iowa, 340, 33 L.R.A.(N.S.) 706, 108 N. W. 902.

The legislature has power to enact any law not prohibited by the
Constitution.    Ex parte Roberts, 166 Mo. 207, 65 S. W. 726; Rad-
cliff v. Wichita Union Stock-Yards Co. 74 Kan. 1, 6 L.R.A.(N.S.)
834, 118 Am. St. Rep. 298, 86 Pac. 150, 10 Ann. Cas. 1016; Hinton v.
Perry County, 84 Miss. 536, 36 So. 565; State ex rel. Henson v. Shep-
pard, 192 Mo. 497, 91 S. W. 477; Wallace v. Reno, 27 Nev. 71, 63
L.R.A. 337, 103 Am. St. Rep. 747, 73 Pac. 528; Ex parte Boyce, 27
Nev. 299, 65 L.R.A. 47, 75 Pac. 1, 1 Ann. Cas. 66; Com. v. Mallet,
27 Pa. Super. Ct. 41; Re Watson, 17 S. D. 486, 97 N. W. 463, 2
Ann. Cas. 321; People v. Young, 18 App. Div. 162, 45 N. Y. Supp.
772; State ex rel. Nichols v. Cherry, 22 Utah, 1, 60 Pac. 1103; Rippe
v. Becker, 56 Minn. 100, 22 L.R.A. 857, 57 N. W. 331; Missouri River
Power Co. v. Steele, 32 Mont. 433, 80 Pac. 1093.

SPALDING, Ch. J.    This is an original application to this court for
the issuance of its prerogative writ to prohibit and enjoin the state
commissioner of insurance from proceeding to establish and put into
operation a state bonding department.    It is designed to test the con-
stitutionality of chapter 194 of the Laws of 1913, entitled, "An Act Es-
tablishing a State Bonding Department in the Office of the Commis-
sioner of Insurance, Providing for the Maintenance Thereof, and Cre-
ating a Reserve Therefor; Prescribing the Duties of Officers Connected
Therewith, Providing for the Payment of Premiums and of Indemni-
ties for Losses, and Providing for the Disposal of the Surplus after Said
Reserve Has Been Created."

Section 1 of such act reads:    "A bonding department of the state

of North Dakota is hereby established, under the management and supervision of the commissioner of insurance." Section 2 authorizes the commissioner of insurance to appoint a deputy and engage clerks as may be necessary to conduct the business of the state bonding department, fix the salaries therefor, and provides that they shall be paid out of the bonding department fund. Section 3 requires such bonding department to bond counties, cities, towns, townships, and school districts in any county in the state, against losses by default of any officer, upon the terms and in the manner later set forth in such act, and that the commissioner shall draw up, with the assistance of the attorney general, a standard form of surety bond, which only shall be used. Section 4 provides that each county official, except justice of the peace and constable, every assessor required by law to furnish a bond, every city, town, school district, and township treasurer required by law to furnish a bond, shall be bonded by the state bonding department, with this proviso, that it shall not bond any official for a greater amount than $50,-000, and any official required to be bonded in a greater sum than $50,000 shall bond, as to the excess, with a responsible surety company, or in any manner satisfactory to the proper authorities. It further makes it optional with township and school district treasurers, to be bonded by the state bonding department, and requires the premiums on all bonds furnished by that department to be paid out of the appropriate public treasury. Section 5 fixes a flat rate of premium on bonds of all officers at 25 cents per hundred dollars of bonds per year, to be paid in advance by the proper authorities to the state treasurer, and that the minimum premium on small and short term officers' bonds shall not be less than $2.50. Section 6 provides that money paid into the state treasury for premiums for bonding officials shall be known as the state bonding department fund, and used as provided in the act. Section 7 prescribes the duties of the state treasurer in regard to receiving premiums and issuing receipts, etc. Section 8 requires all bonds issued by the department to run until the expiration of the officer's term of office, and provides that, when such term is less than one year, a full year's premium shall be charged. Section 9 requires the commissioner of insurance to estimate, at the beginning of each year, the amount required for salaries and expenses of the department for the current year, and to reserve the same from the premiums received,

27 N. D.—6.

and makes the amount of premium receipts remaining available for payment of losses. It requires losses to be paid promptly as soon as the amount shall be determined by the commissioner of insurance and a report thereof made, and that any sum remaining unexpended at the end of any year shall remain in the state bonding fund until the amount of $100,000 is accumulated, after which any excess over that sum shall be distributed to the various counties, etc., in proportion to the amount of premiums paid into the fund by the same, and that, in case there are not sufficient funds to meet the losses sustained after the reservation of expenses for the year, such losses shall be paid as funds are accumulated in the bonding fund by the collection of premiums. Section 10 provides for reports to be published and made to the governor and legislative assembly. Section 11 requires the commissioner to obtain from the various bonded officials annual statements of their receipts and disbursements, etc., verified by an officer, and provides how the commissioner shall verify such statements, and requires him to furnish application blanks to the proper officers. It then provides, that, if, in the opinion of the commissioner of insurance, "it is advisable for the safety of the state to reject an application for a bond, or cancel the bond of any official bonded, he shall submit such application, also the person's name whose bond he proposes to cancel, to the state auditing board, together with his reasons for rejecting or canceling the same, and if the auditing board rejects such application or cancels any bond, such official may bond in any manner satisfactory to the proper authorities of the city, village, school district, township, or county, as the case may be." It then provides for notice of the rejection of any application by the board being given to the official, and that before a bond is canceled the commissioner shall notify such person by registered mail, demanding from him a receipt thereof, and upon the return of such receipt, that the board shall cancel such bond six days thereafter, and that, when a default is reported, the commissioner shall carefully inquire into and investigate the same before the indemnity is paid; that the state examiner shall examine and check the accounts of a defaulting official, and file his report with the commissioner of insurance, stating the amount due upon the defaulting officer's bond.

Many grounds are presented by the applicant upon which he claims the statute is in conflict with the Constitution. It will not be necessary

to pass upon all of these questions. We only pass upon some which are too plain to justify any controversy. The fact that other grounds urged by relator are not passed upon is not to be taken as a determination one way or the other.

On behalf of the state, among other things, it is contended that the law is not obnoxious to the Constitution, because there is no express provision in the Constitution prohibiting the state from establishing a bonding department or conducting a bonding business. There is no question of the correctness of this rule as a general principle, when to it are added implied prohibitions; and it may be necessary to take other things into consideration besides those found on the face of the Constitution. Courts must often determine what the object of a provision of that instrument is, and to do this, apply it to conditions existing at the time of its adoption, and thereby determine from the facts, as well as the language of the instrument, whether it has relation to a given condition or law.

It is also urged by the state under this head, that the state has the broadest powers imaginable to engage in any business or occupation, not in terms prohibited by the Constitution. It seeks also to justify this law by the assertion that surety companies were charging excessive rates of premium when it was enacted, for furnishing bonds for public officials, and that the state can do the business at less expense to the municipalities or communities required to bond their officials. On the other hand, it is urged that figures presented on argument show the rates charged by the surety companies, if correctly quoted, and those under this statute, do not harmonize. The surety companies charge different rates on bonds for different officials, the rate depending largely upon the character of the risk, it being highest for those offices where the opportunity and temptation for peculation and the skill required are greatest, while the state rate is the same regardless of the risk. Naturally this results, according to the tables presented, in a number of officers being required by the surety companies to pay a higher rate than is contemplated by the flat rate established by the statute in question, while some officers pay a lower rate to surety companies than to the state. All such comparisons, however, are beside the issue.

The state was not organized as an institution to engage in any line of private business, whenever, in the judgment of some legislative

assembly, it might be thought that it could conduct business more cheaply than is done by individuals or private parties. It is contended, however, that this act is intended for the protection of subdivisions of the state itself, and is therefore justifiable. This question is not determined.

1. The act in question is invalid because it is an unwarranted delegation of purely legislative powers to the commissioner of insurance. It requires counties, cities, and other subdivisions of the state to pay premiums, the total sum so paid constituting the bonding fund. This fund is only limited by the number of officials and subdivisions coming within its provisions, most of which are required to do so, while with some others it is optional.

From the total fund the commissioner is authorized to arbitrarily determine how much will be necessary to pay deputies, clerks, and the other expenses of his department, and is required to set aside from such fund the amount so decided upon by him. No limit is placed by the act in question upon the amount which may be used for these purposes. It is left solely with the commissioner, and only the remaining part of the fund is available to pay liabilities incurred during each year. The separation of this fund into two parts, one for the payment of expenses and the other for the payment of losses, is a legislative act, and the very least that the legislature can do and have the act valid in this respect is to place a limit upon the amount of the fund to be used in the payment of expenses.

The people, through their Constitution, have very jealously guarded the functions of the respective departments of government. The legislative assembly has been given the sole power to legislate. While it is true that it is often difficult to determine whether a specific act falls within the legislative function or the executive, we are not hampered by any uncertainty in the case at bar. This court recently passed upon a very important case, as nearly identical with this as two cases can well be. In State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724, known as the Capitol Commission Case, this court passed upon an act providing for the erection of capitol buildings at the seat of government. That act dealt with an indefinite fund, authorized a commission appointed by the governor to construct two buildings, a capitol and an executive mansion, and left it to the determination of the commission

what portion of the fund should be employed in the erection of each of the two buildings. No limit was placed upon the cost of the executive mansion, and, we may say, not more than an implied limit upon the total cost of the two. That case was very thoroughly briefed and carefully considered by this court when no member of the present court sat upon this bench. The court said: "The commission has absolute power under this law to fix the limits of the cost of each of said buildings. They finally determined what sum shall be used for each building. We think that such discretion should have been exercised by the legislature. It is not properly an administrative discretion. What the several buildings shall cost should have been limited by the act, as it is a substantive matter of legislative discretion that the legislature cannot delegate. . . . They are purely and clearly legislative powers, and cannot properly be delegated to persons or boards." After citing authorities, the court continues: "These cases, as well as those cited as bearing upon the powers of the legislature, unite in the general principle that agents or officers cannot be intrusted with powers of purely governmental or legislative character. They announce a salutory principle of constitutional law which should not be departed from."

In Minnesota, Pennsylvania, and Wisconsin, it has been held that the legislature cannot delegate to a state insurance commissioner the preparation of a printed form in blank of a contract or policy of fire insurance, together with such provisions, agreements, or conditions as may be indorsed thereon, or added thereto, and to which all subsequent insurance contracts must conform, as this is a delegation of legislative power. Anderson v. Manchester F. Assur. Co. 59 Minn. 182, 28 L.R.A. 609, 50 Am. St. Rep. 400, 60 N. W. 1095, 63 N. W. 241; O'Neil v. American F. Ins. Co. 166 Pa. 72, 26 L.R.A. 715, 45 Am. St. Rep. 650, 30 Atl. 943; Dowling v. Lancashire Ins. Co. 92 Wis. 63, 31 L.R.A. 112, 65 N. W. 738.

2. The act in question is invalid because it is an unwarranted delegation of judicial power to the commissioner of insurance, and to the other officials named in the act. It permits and requires the trial and determination of questions of both fact and law, relating to the cancelation of bonds and to the payment of losses and to the violation of other duties of the officials included in the act, including the validity of the claims of subdivisions of the state on the fund, and indirectly the

liability by the officers named, by the officials named in the act, none of whom are judicial officers. It gives the commissioner of insurance the arbitrary power to determine when a default or a liability exists, and the power to fix the amount of the liability to the county or other subdivision. Neither is this arbitrary power on the part of the commissioner limited to the determination of the amount of any defalcations which may occur.

The bonds required of most, if not all, the officials enumerated in the act, are conditioned for the faithful and impartial discharge of the duties of the office, in addition to the condition requiring a true account of all moneys and property of every kind that may come into the official's hands. Some of the officials named received no money in an official capacity, and the condition of the bond only relates in such cases to the faithful and impartial performance of the duties. It is too evident to permit discussion that before a recovery can be had upon a bond of this nature, or that part of the bond of a treasurer or other official who does receive money, which relates to the faithful and impartial discharge of the duties of his office, someone must determine whether the conditions of the bond have been violated, and if so, the extent of the injury resulting therefrom to the county or subdivision of which he is an official. Would anyone contend that the determination of such liability and the extent of the injury, if any, is not a judicial act, rather than an administrative or executive duty? It involves not simply a computation in dollars and cents, and thereby the ascertainment of a fact, but the determination of legal questions relating to the duties of an official, the finding of facts, and the application of the law to the facts, and in effect the rendition of a judgment on the facts so found and the law as ascertained and applied, and it seems to us as clearly a judicial act as devolves upon any court in the determination of the issues in any form of action.

We have had so recently under consideration a statute, in most of these respects and in principle, parallel with this, that no extended discussion of the subject or citation of authorities is necessary. If anything, this act more clearly delegates judicial powers than did the one to which we refer. In State ex rel. Standard Oil Co. v. Blaisdell, 22 N. D. 86, 132 N. W. 769, Ann. Cas. 1913E, 1089, we had under consideration a statute giving the secretary of state powers similar to

those here attempted to be conferred upon the commissioner of insurance, and it was therein held that the act was invalid because it delegated judicial power to an executive officer, as well as deprived a party of property without due process of law. We then held, that, as applicable to that case, judicial power consisted in the authority vested in some court, officer, or person, to hear and determine when the rights of persons or property, or the propriety of doing an act, is the subject-matter of adjudication, and that official action, the result of judgment or discretion in such case, is a judicial act.

The terms of the statute under consideration bring the duties sought to be imposed upon the commissioner of insurance and auditing board squarely within that definition. Judicial power determines what the law is, and what the rights of the parties are with reference to transactions already had, and wherever an act undertakes to determine a question of right or obligation or property, as the foundation upon which it proceeds, such act is to that extent a judicial one. Sinking Fund Cases, 99 U. S. 761, 25 L. ed. 516; Wulzen v. San Francisco County, 101 Cal. 15, 40 Am. St. Rep. 17, 35 Pac. 353. It is also defined as "the province of deciding private disputes between or concerning persons." Merrill v. Sherburne, 1 N. H. 199, 8 Am. Dec. 52, and authorities cited in note 5, 6 Am. & Eng. Enc. Law, 1032.

A constitutional grant of judicial power to one department carries the whole judicial power of the state, and excludes any exercise thereof by other departments. 6 Am. & Eng. Enc. Law, 1053. To assume to vest judicial functions elsewhere than in the tribunal established by the Constitution is clearly without the sphere of legislative action, and statutes which attempt to confer judicial powers upon executive or ministerial officers are invalid. State ex rel. Hovey v. Noble, 118 Ind. 350, 4 L.R.A. 101, 10 Am. St. Rep. 143, 21 N. E. 244; United States v. Rider, 50 Fed. 406; People ex rel. Kern v. Chase, 165 Ill. 527, 36 L.R.A. 105, 46 N. E. 454; State ex rel. Monnett v. Guilbert, 56 Ohio St. 575, 38 L.R.A. 519, 60 Am. St. Rep. 756, 47 N. E. 551. These principles are so strictly adhered to that it is held in states where law and equity are separately administered, that no interference can be had in the respective jurisdictions of courts of law and of equity. Indeed, it is also held that the legislature cannot transfer to an inferior court any of the established powers of the supreme court created by the Con-

stitution. Carpentier v. Montgomery, 13 Wall. 480, 20 L. ed. 698; Conger v. Convery, 52 N. J. L. 440, 20 Atl. 166.

3. The protection of surety companies is of no greater importance than the protection of the counties, cities, and other subdivisions whose officials are required to furnish security through the bonding department. In fact, the protection of the taxpayers of these divisions is of supreme importance. If, in any such subdivision, a defalcation occurs, or even if it is claimed that an official has been guilty of embezzlement or misconduct, imposing a liability upon his bondsmen, and the parties disagree on any such question, it is the right of such subdivision to have the question of the defalcation or other misconduct determined, and the amount of the liability, if any, adjudicated and established by the constitutional body constituted for such purpose. And it is equally the right of the municipality or subdivision to be given due notice of time and place for the consideration and adjudication of all disputed questions. This act furnishes no such protection to the public. Neither notice, hearing, nor time is provided for.

It is fundamental in all civilized governments, at least in those where the people have any conception of justice and of its administration, that no person or institution can be deprived of property without due notice and an opportunity to be heard, and a law which fails to provide these, and places it in the power of any official to arbitrarily determine a right, without affording the person or the municipality or other organization interested any opportunity for preparation and hearing by a body constituted for such purpose, when there are such bodies provided by the Constitution, deprives that person or community of property without due process of law, and no right of an American, whether an individual or a community, is more sacred than the right thus attempted to be protected through the organic law of the state and of the nation.

The definitions of due process of law are various, and it is extremely difficult to formulate any definition which is applicable in all cases or to all proceedings. One of the most frequently quoted definitions was. given by Mr. Webster in the celebrated Dartmouth College Case, and has been cited by many courts with approval, as coming probably as. near to a general definition as any that has been announced. It is: "By 'the law of the land' is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and.

renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not therefore to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees, and forfeitures, in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void." Dartmouth College v. Woodward, 4 Wheat. 518, 581, 4 L. ed. 620, 645.

One essential to due process of law, one, perhaps, which is applicable to as large a class of cases as any we find, is given in McGehee on Due Process of Law, p. 1, and is substantially the same as found in Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226, 41 L. ed. 979, 17 Sup. Ct. Rep. 581. " 'Due process of law,' as the meaning of the words has been developed in American decisions, implies the administration of equal laws according to established rules not violative of the fundamental principles of private right, by a competent tribunal having jurisdiction of the case and proceeding upon notice and hearing." And that author makes the following observations: "The basis of due process, orderly proceedings, and an opportunity to defend, must be inherent in every body of law or custom, as soon as it advances beyond the state of uncontrolled vengeance; indeed, the emphasis placed on a literal adherence to customary rules of procedure is one of the most marked features of primitive law, and with the advance of civilization and the application of reflection to old collections of custom, the principle of notice and an opportunity to defend would take its place, as a part of the *jus gentium,* to become later the law of nature or the law of God."

It was said in Hurtado v. California, 110 U. S. 516, 28 L. ed. 232, 4 Sup. Ct. Rep. 111, 292: "In this country written Constitutions were deemed essential to protect the rights and liberties of the people against the encroachments of power delegated to their governments, and the provisions of Magna Charta were incorporated into Bills of Rights. They were limitations upon all the powers of government, legislative as well as executive and judicial. It necessarily happened

therefore, that, as these broad and general maxims of liberty and justice held in our system a different place and performed a different function from their position and office in English constitutional history and law, they would receive and justify a corresponding and more comprehensive interpretation. Applied in England only as guards against executive usurpation and tyranny, here they have become bulwarks also against arbitrary legislation."

In Bank of Columbia v. Okely, 4 Wheat. 235, 4 L. ed. 559, it was said: "As to the words from Magna Charta incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this, that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice."

Chancellor Kent says in vol. 2 of his Commentaries, p. 13, that " 'due process of law' means law in its regular course of administration through courts of justice." While it is true that the proceedings need only be appropriate to the case, and just to the parties to be affected, in Hagar v. Reclamation Dist. 111 U. S. 701, 28 L. ed. 569, 4 Sup. Ct. Rep. 663, it is deemed essential that there must be notice and an opportunity to be heard before some official board or court, whenever life, liberty, or the title or possession of property are involved. Fortescue, J., in Dr. Bentley's Case, Rex v. University of Cambridge, 1 Strange, 567, said: "The laws of God and man both give the party an opportunity to make his defense, if he has any. I remember to have heard it observed by a very learned man, upon such an occasion, that even God himself did not pass sentence upon Adam before he was called upon to make his defense. 'Adam' (says God) 'where art thou? Hast thou not eaten of the tree whereof I commanded thee that thou shouldst not eat?' And the same question was put to Eve also. This doctrine was adopted into American jurisprudence to the fullest extent, and was referred to the principles either of natural justice, of international law, or of the common law." McGehee, Due Process of Law, 75. Judge Story said: "It is a rule founded upon the first principles of natural justice, that a party shall have an opportunity to be heard in his defense, before his property is condemned;" and the Supreme Court of the United States in Galpin v. Page, 18 Wall. 350, 21 L. ed. 959, and

in Hovey v. Elliott, 167 U. S. 409, 42 L. ed. 215, 17 Sup. Ct. Rep. 841, says: "It is a rule as old as the law, and never more to be respected than now, that no one shall be personally bound until he has had his day in court, by which is meant until he has been duly cited to appear and has been afforded an opportunity to be heard. Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and never can be upheld where justice is justly administered." The clauses of our Constitutions guarantying the law of the land and due process of law have always been held to include the opportunity to present any defense which might affect the decision of the court or tribunal. The opportunity to defend implies notice of an official inquiry into the facts, and notice and hearing are necessary to due process of law,— are, indeed, the essential elements thereof. McGehee, Due Process of Law, 76; Simon v. Craft, 182 U. S. 436, 45 L. ed. 1170, 21 Sup. Ct. Rep. 836; Hooker v. Los Angeles, 188 U. S. 318, 47 L. ed. 491, 63 L.R.A. 471, 23 Sup. Ct. Rep. 395. The notice of the proposed course of action which will result in the taking of life, liberty, or property must, in order to be due process, be reasonable in time, so as to give a real opportunity to present defenses (McGehee, Due Process of Law, 77), and this right to due process must rest upon a basis more substantial than favor or discretion. Roller v. Holly, 176 U. S. 398, 44 L. ed. 520, 20 Sup. Ct. Rep. 410.

Under the terms of the act we are considering, the insurance commissioner is the judge and the jury, as well as the custodian of the fund, and to him it is attempted to impart the power to serve in all these capacities, and determine the validity of the claims made by any subdivisions of the state to a part of the fund. It will thus be seen that it is serving in substantially conflicting capacities. There is no contract on the part of the state to pay. There is no one whom the municipality can sue to enforce the so-called bond. If a claim of liability is made, the state cannot be sued, because it has not contracted or been made liable, and further, if it could be sued, no judgment obtained by a municipality could be enforced, because the only manner provided by statute for enforcing a money judgment against the state is by means of a tax, and no judgment can be paid, and no action can be maintained, until the state auditor has rejected a claim; but the state auditor

has nothing to do with claims of liability under the provisions of this statute. It is left wholly with the commissioner of insurance to be paid only out of the bonding fund, and mandamus will not lie against the commissioner, because the settlement of losses and liabilities involves, as we have shown, acts of judicial discretion and judgment, not ministerial, and an action cannot be maintained against the bonding department, for that is not an entity, and has only agreed to pay in case the commissioner says payment shall be made. Counsel for the state argues that "no resort can be had against the state or any of the other political subdivisions, to meet any such expenses or losses." It is apparent that the enactment in question does not provide due process of law, and that such process is not furnished by any other provision in our Code applicable to the proceedings contemplated by the enactment under consideration. The writ prayed for will issue.

BURKE, J., (dissenting). Am unable to concur in the majority opinion, because it ignores the principal question sought to be raised, and misstates the contention of the state.

The parties to this litigation wished to have settled the right of the state to enact this class of legislation, and not whether there were minor defects in the bill itself. The majority opinion fails to give any light upon this question, and the next legislature will be totally in the dark as to its powers in the premises. While there are minor defects in the law as pointed out in the majority opinion, I think they can be remedied by amendment.