GEORGE H. WILDER, Appellant, v. R. B. MURPHY, W. J. Church, F. E. Diehl, Bertha Palmer, and Joseph Kitchen, as Members of and Constituting the Board of Administration of the State of North Dakota, Respondents.

(218 N. W. 156.)

**Constitutional law — statute delegating legislative power to board of administration held unconstitutional; statute authorizing board of administration to convey sites to holding association, held unconstitutional.**

Chapter 257, Sess. Laws 1927, which authorizes .the state board of administration to convey for terms not exceeding fifty years, to institutional holding. associations formed pursuant to chapter 258, Sess. Laws 1927, sites upon the campus of any state educational institution whereon dormitories shall be erected, and to enter into contracts with such institutional holding associations. to lease such dormitories and to pay "as rental for such property the net income derived therefrom and from other dormitory buildings on the same campus, a sum sufficient to pay the principal and interest thereon of any indebtedness of the holding association incurred for the construction of such building; on the amortization plan, or otherwise," and to "pledge such income for that purpose and enter into any other contract with such association as. may be for the best interest of the educational institution affected," is unconstitutional and void in that:

(a) It delegates legislative power to an administrative board in violation. of § 25 of the state Constitution.

---

Note.—On delegation of legislative power to administrative boards, see 6 R. C. L. 179; 5 R. C. L. Supp. 324; 6 R. C. L. Supp. 362; 7 R. C. L. Supp. 174.

(b) It authorizes the creation of a state debt contrary to the prohibitions of § 182 of the state Constitution.

Opinion filed February 23, 1928.

Constitutional Law, 12 C. J. § 323 p. 839 n. 71. States, 36 Cyc. p. 883 n. 27.

Appeal from the District Court of Burleigh County, *Jansonius,* J.

Action for injunctive relief. From an order of the district court sustaining the defendants' demurrer to his complaint, plaintiff appeals.

Reversed.

*McIntyre, Burtness, & Robbins,* for appellant.

By § 25 of the state Constitution the legislative power of the state is vested in the legislative assembly, and in the people through the initiative and referendum. State v. Hall, 48 N. D. 11, 186 N. W. 284.

Any delegation of legislative power to an administrative board is contrary to both the spirit and letter of the Constitution. State v. Budge, 14 N. D. 532, 105 N. W. 724; State v. Taylor, 27 N. D. 77, 145 N. W. 425.

The general rule is that any statute or ordinance that purports to vest arbitrary discretion in public officers without prescribing a rule or standard for their guidance is unconstitutional. Yick Wo v. Hopkins, 118 N. E. 356; 36 L. ed. 220; State v. Duberry, 44 La. Ann. 1119, 11 So. 718.

The building of schoolhouses does not come within any well-defined acceptation of "support of the common schools." Sheldon v. Purdy, 17 Wash. 135, 49 Pac. 228.

In the instant case, not only is the income for the other dormitories pledged, but is used for the payment of the debt incurred by the construction of the dormitory. Therefore the situation brings the obligation within the debt limit. Lobdell v. Chicago, 227 Ill. 218, 81 N. E. 354.

"No refinement of contracts or technical rule of law can make this transaction less than a loan of credit—to the parties primarily liable for the cost." Martin v. Tyler, 4 N. D. 278.

*George F. Shafer,* Attorney General, *George I. Reimestad,* Assistant Attorney General, and *C. L. Young,* for respondents.

It is within the power of the legislature to authorize a contract to be

made which is not in the nature of a state obligation in the usual sense, but is a special, limited obligation, payable only out of a special fund. Sargent County v. State, 47 N. D. 561.

"Although, according to the weight of authority, the amount of an appropriation must be definite and certain, and the sum is not specified in the act in question, it becomes definite and certain when the moneys from such sources are collected and turned in to the state treasurer. All such revenues shall be appropriated under the terms of the statute." Holmes v. Olcott (Or.) 189 Pac. 202.

"The legislature may exclude from the provisions of a statute such classes of objects or persons as are not similarly situated with those included therein, in respect to the nature of the legislation." Edmonds v. Herbrandson, 2 N. D. 270.

NUESSLE, Ch. J. Plaintiff, a resident and taxpayer of the state of North Dakota, by this action seeks to challenge the constitutionality of chapter 257, Sess. Laws 1927. This chapter provides:

"For the purpose of providing dormitories or residence halls to be used in connection with the University, agricultural college or any of the normal schools or other state educational institutions, and to permit the construction, financing and ultimate acquisition thereof, the state board of administration may convey a site for any such building upon the campus of any state educational institution (or) to an institutional holding association for a term not exceeding fifty years, upon condition that such association shall construct on the leased premises such building, with necessary appurtenances for dormitory or residence hall purposes, as the state board of administration shall approve, and shall lease the same to the state board of administration, upon such terms regarding rentals, maintenance, payment of indebtedness, and the ultimate transfer of title to the state for the use of the educational institution affected, as such board shall prescribe. . . .

"The state board of administration may contract to pay as rental for such property out of the net income derived therefrom and from other dormitory buildings on the same campus, a sum sufficient to pay the principal and the interest thereon of any indebtedness of the holding association incurred for the construction of such building; on the amortization plan, or otherwise, and may pledge such income for that

purpose and enter into any other contract with such association as may be for the best interest of the educational institution affected. Provided, that the state shall incur no liability by reason of the exercise of the authority hereby granted to the state board of administration, and provided further, that any building and its appurtenances so constructed together with the site upon which it is located and all bonds or other evidences of debt issued by such association shall be exempt from taxation."

Chapter 258, companion statute to chapter 257, provides:·

"Non-profit sharing corporations to be known as institutional holding associations, may be formed for the purpose of erecting and managing buildings and their necessary appurtenances on the campus of the state university, the agricultural college, or any of the normal schools or other state educational institutions, in the manner, and with the rights, and subject to the restrictions and liabilities, prescribed by chapter 12 of the Civil Code of the Compiled Laws of 1913, except as herein otherwise provided. . . .

"The articles of incorporation shall set forth the name of the association, the place where its business is to be transacted, the term for which it is to exist, the number of members and the conditions of membership and succession therein, the number of its directors and the names and residences of those who shall serve until their successors are elected and qualified, the purpose for which it is formed, and the amount of indebtedness authorized, and the plan for the payment thereof, and shall provide that the association is non-profit sharing, that its indebtedness shall be paid out of its net income from rentals, and that when all debts are paid its right and interest in the building site shall terminate and its property, including all buildings and improvements, shall become the property of the state. . . .

"Such association may construct buildings with their appurtenances only upon the campus of any such educational institution, according to plans and specifications therefor approved by the state board of administration, and as a prerequisite to its right so to do shall secure a site therefor from such board. The association may contract debts and issue bonds or other evidences of indebtedness to construct such buildings, and to secure the payment thereof may mortgage its property and pledge all rentals to be received therefor, but its debts shall not

exceed in amount the value of the property, both real and personal, actually owned by the association, and the provisions for the payment thereof shall be approved by the state board of administration. The association shall not issue corporate stock, nor shall any member thereof have or acquire any divisional share in its property, and all of its net income shall be applied to the payment of its indebtedness. When such indebtedness is paid the title to all buildings and improvements of the association shall be conveyed to and shall vest in the state. The transfer or conveyance of the property of the association, except in accordance with the provisions of this act, is prohibited."

The complaint after setting forth other appropriate matters of fact, alleges that a corporation to be known as the University Dormitory Association of Grand Forks, North Dakota, has been organized pursuant to the provisions of chapter 258, supra; that this corporation was organized for the purpose of erecting a dormitory or dormitories on the campus of the state university; that the defendants, the board of administration, have approved the organization of such corporation and intend to proceed pursuant to the provisions of chapter 257, supra, to convey to such corporation a portion of the campus of the state university and enter into a contract or contracts with the corporation to lease such dormitories as may be erected thereon; that the acts in question are unconstitutional and void for that they are contrary to many of the prohibitions of the constitution of the state; and prays for injunctive relief. The defendants demurred to the complaint. The district court sustained the demurrer and this appeal is from the order entered accordingly.

In considering the challenge to the constitutionality of the act thus interposed by the plaintiff, we must remember certain rules that control in the consideration of such questions. Every reasonable presumption is in favor of the constitutionality of a statute enacted by the legislature. State ex rel. Linde v. Taylor, 33 N. D. 76, L.R.A. 1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583; O'Laughlin v. Carlson, 30 N. D. 213, 152 N. W. 675. And the contrary will not be held unless its unconstitutionality clearly appears. Buttfield v. Stranahan, 192 U. S. 470, 48 L. ed. 525, 24 Sup. Ct. Rep. 349. Where the constitutionality of a statute depends upon the power of the legislature to enact it, its validity must be tested, not by what has been or

is being done under it, but by the things which may be done under it. State ex rel. Frich v. Stark County, 14 N. D. 368, 103 N. W. 913; State ex rel. Hughes v. Milhollan, 50 N. D. 184, 195 N. W. 292.

Plaintiff strenuously contends that chapter 257, the act in question, violates the provisions of § 25 of the Constitution in that it attempts to delegate legislative power to an administrative board. Section 25 of the Constitution, as amended, vests the legislative power in the legislative assembly and in the people through the initiative and referendum. State ex rel. Langer v. Olson, 44 N. D. 614, 176 N. W. 528. Except as authorized by the Constitution the legislative power of the legislature must be exercised by it alone and cannot be delegated. State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724; State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 425; State ex rel. Fargo v. Wetz, 40 N. D. 299, 5 A.L.R. 731, 168 N. W. 835; 12 C. J. 839; 6 R. C. L. 164. But any power not legislative in character which the legislature may exercise, it may delegate. 12 C. J. 840. So the determination of this particular challenge to the statute depends wholly on whether any legislative powers are delegated by the statute.

The appellant contends that chapter 257 confers upon the board of administration the power to determine as to the necessity for dormitories for the various educational institutions, the number that shall be built, the character of the buildings to be built, the cost thereof, the manner in which they shall be paid for, the terms upon which these dormitories shall ultimately be conveyed to the state, the power to pledge the property of the state (the income from the dormitories) through any period up to fifty years, and the power to enter into any other contract that may be for the best interests of the particular institution affected, and that all of these powers are legislative and not administrative.

It is difficult, if not impossible, to lay down exactly the line that marks the distinction between administrative and legislative functions. As was said by the Supreme Court of the United States in Mutual Film Corp. v. Industrial Commission, 236 U. S. 230, 59 L. ed. 552, 35 Sup. Ct. Rep. 387, Ann. Cas. 1916C, 296: "While administration and legislation are quite distinct powers, the line which separates exactly their exercise is not easy to define in words. It is best recognized in illustrations. Undoubtedly the legislature must declare the

policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply. If this could not be done there would be infinite confusion in the laws, and in an effort to detail and particularize, they would miss sufficiency both in provision and execution." The right to delegate legislative power has on various occasions heretofore been questioned in this court and what was said in those cases will largely answer the present question. See State ex rel. Rusk v. Budge, supra; State ex rel. Miller v. Taylor, 27 N. D. 77, 145 N. W. 425, supra; State ex rel. Fargo v. Wetz, supra; State ex rel. Gaulke v. Turner, 37 N. D. 635, 164 N. W. 924. In the instant case the legislature has neither determined the question of the necessity for the buildings nor laid down any rule to guide its agent, the board of administration, in determining that question. It has evidenced a purpose to erect buildings for dormitories upon the grounds of the several educational institutions of the state as the same may be required. It has provided how the board shall proceed in the erection of such buildings and the manner in which they shall be financed. It has left to the discretion of the board the matter of determining when such buildings shall be built and their number and character, as well as the manner in which they shall be conveyed to the state. The defendants insist that these are merely administrative duties and that the legislature could properly delegate them to the board. But the plaintiff urges that even though this be so the statute does not rest with the delegation of these matters; that it also provides that the board "may enter into any other contract with such association as may be for the best interests of the educational institutions affected." Defendants counter that this phrase thus questioned must be considered as germane to the purpose of the statute as theretofore expressed and intended simply as a provision to cover matters of detail necessary to carry out that purpose; that in fact it confers no powers to contract above those already given. Plaintiff further urges against the statute that the matter of the cost of buildings that may be erected under it is something which is left solely to the judgment of the board; that there is no maximum limit fixed beyond which the board may not go, and that it is left to the board to say as to when the buildings shall be paid for, whether in one year

or through a period of fifty years. On the other hand, the defendants contend that the statute fixes a limit upon the amounts which may be expended in the erection of such buildings, and that while that limit is not fixed in any definite sum in dollars and cents, it is fixed by the amount of the rentals that may be secured from the buildings to be built and the other dormitories on the same campus with them. In other words, that the limit is the limit of practicability. Defendants further contend that whether any building that may be built shall be paid for in one year or fifty years is a matter which may be entrusted to the judgment and discretion of the board and that time is merely one factor entering into the determination of the amounts which may be expended.

Without passing upon the validity of the statute in delegating power to the board in the other respects challenged by the plaintiff, it seems to us that when the legislature empowered the board to expend moneys of the state without any limitation as to the amount thereof other than is imposed by the elastic provisions of chapter 257, it violated the rule laid down in the case of State ex rel. Rusk v. Budge, 14 N. D. 532, 105 N. W. 724, supra. In that case the legislature had provided for the erection of a capitol building and an executive mansion to be paid for out of the funds derived from the use and disposition of public lands granted to the state by Congress. Under the Constitution these funds could only be disposed of "in the manner provided by the legislature." The act there further provided for the appointment of a commission by the governor to construct such buildings, fixed a maximum limit upon the amount that might be expended in the construction of *both* buildings, but left it to the judgment of the commission as to what portion of this amount should be expended on *each* of the buildings. The court held that this discretion thus reposed in the commission was not properly an administrative discretion and therefore the act was unconstitutional and void. In the instant case no real limitation is imposed by the act beyond which the board may not go in its expenditures. The board itself fixes the amount of the income (by fixing the charges to the occupants) from the buildings to be erected and from other dormitories belonging to the particular institutions. All of this income may be resorted to and used by the board. It is stipulated in the instant case that there are now upon the campus of the state uni-

versity three dormitories and that the income from these dormitories amounts to $10,000 annually. If further dormitories are erected this income will be appreciably increased. The board is empowered to pledge and pay all of such income through a period of fifty years. It is true that the statute says that the net income of all the dormitories may be paid as rental for the use of the building to be erected, but it likewise provides that this "rental" shall be sufficient to pay the interest upon any bonds that may be issued to procure the moneys with which the building is to be built, and also to pay the principal upon the amortization plan or otherwise. So though the statute designates this payment as "rental" it contemplates that it shall be more than rental. Not only is the board authorized to thus pledge and pay the income from these dormitories but it is left to the board to fix such income in that the board determines the rate that shall be charged for the use of the dormitories. And the only limit placed upon this rate is the economic limit imposed by the law of supply and demand. In other words, the board is permitted to charge all that the traffic will bear. Clearly this limitation of practicability is in fact no limitation, and thus no limitation is fixed by the act upon the amount which the board may raise and expend. The power to appropriate money is purely a legislative power. Const. § 186; Holmes v. Olcott, 96 Or. 33, 189 Pac. 202. The act in fact delegates this power and thus is subject to the plaintiff's challenge.

But there is another ground urged by the plaintiff on account of which the act must be held unconstitutional. Section 182 of the Constitution provides:

". . . No further indebtedness (than that now existing) shall be incurred by the state unless evidenced by a bond issue which shall be authorized by law for certain purposes to be clearly defined. Every law authorizing a bond issue shall provide for levying an annual tax or make other provision sufficient to pay the interest semi-annually and the principal within thirty years from the date of the issue of such bonds. . . . No debt in excess of the limit named herein shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war or to provide for public defense in case of threatened hostilities."

The plaintiff contends that chapter 257, supra, in effect authorizes the state board of administration to incur a state indebtedness contrary

to the provisions of this section of the Constitution. He argues that though chapter 257 specifies that "the state shall incur no liability by reason of the exercise of the authority hereby granted to the board of administration," nevertheless the authority given by the statute to the board of administration to enter into the contracts and convey and pledge the property of the state, that is, sites for the buildings and the income from the dormitories, in effect is authority to create a debt within the meaning of that term as used in § 182. It seems to us that there is substance to this contention. An examination of chapter 258, supra, discloses that the corporation contemplated by this statute is, as the attorney general has argued in this case, a corporation organized for a public purpose. It is non-profit sharing. No stock is issued. Its members acquire no divisional share in its property. It takes life at the command of the board of administration. It has no power to contract except in accordance with the will of the board of administration. It functions merely to the extent of holding property and issuing bonds. Its net income must be devoted to the payment of its debts. And when its debts are paid its property becomes the property of the state. In effect it is an agency of the state, a device resorted to in order to enable the state through the board of administration to erect certain improvements for the state. It is to this sort of a corporation that the board of administration conveys (the site) and pledges and pays (the income from its dormitories) the property of the state, and it is this sort of a corporation that on the security of this property thus pledged and conveyed and of the buildings erected by it under the direction of the board of administration, issues bonds and procures money with which to erect these buildings. Though the statute provides that the state shall incur no liability by reason of anything that may be done by the board under the authority thus conferred, and though no bonds of the state are issued, nevertheless the fact remains that the property of the state is mortgaged and pledged and to that extent there is an obligation to pay on the part of the state. Thus it seems to us there is created a debt within the meaning of that term as used in the constitutional prohibition. In our judgment the case of State ex rel. University & School Lands v. McMillan, 12 N. D. 280, 96 N. W. 310, by its reasoning and its approval of the doctrine of the cases therein cited is conclusive on this question. That case arose under a statute by which the

legislature sought to enable certain educational institutions to erect buildings to supply their needs. It was not then possible to procure the necessary funds wherewith to erect these buildings through the issue of obligations of the state, so the statute provided that the boards of trustees of the institutions should be authorized to issue bonds for such sums of money as they might require not exceeding a specified amount, the bonds to be designated as the bonds of the several educational institutions and to be paid from interest and income derived from the lands belonging to such institutions. The court held that, notwithstanding the provisions of the statute to the contrary, these obligations were in fact the obligations of the state and, since the act authorized the creation of a state debt in excess of the limit provided by § 182, the act was unconstitutional and void. We cannot do better here than quote from the McMillan Case:

". . . This particular scheme of finance, while indigenous in the state, is not without its parallels. The state of New York at an early date engaged largely in works of internal improvement. It built and owned the Erie canal, and in doing so incurred a large state indebtedness, with the result that the entire subject was placed under constitutional control in 1846. The net annual revenue from the canal amounted approximately to $800,000. The Constitution required that the net revenues should be applied as follows: First, a fixed sum to pay the interest and apply on the principal of what was known as the 'canal debt;' second, another fixed sum to apply upon the state debt known as the 'general fund debt;' third, a definite sum to the general revenue fund of the state. It was then provided that, after satisfying the above requirements, 'the remainder of the revenues of the said canal shall in each fiscal year be applied in such manner as the legislature shall direct to the completion of the Erie canal enlargement and the Genesee valley and Black River canals until the said canals shall be completed.' In order to hasten the completion of the canal, the legislature of 1851 passed an act authorizing the comptroller to issue canal revenue certificates to the amount of $9,000,000, payable out of the surplus revenue of the canals above the amounts required by the constitutional provisions above referred to, and required that said certificates 'shall purport on their face to be issued by virtue of this act and without any other liability, obligation or pledge on the part of

the state than such as is contained in this act.' Elsewhere the act pro-
vided that 'the state shall in no event be liable to make up any de-
ficiency in the canal revenue or to redeem the certificates from any
other source than the canal revenues, as directed by the act.' The
question as to whether this act was in violation of the provisions of
the Constitution forbidding the creation of a state debt in excess of
$1,000,000 was presented to the Supreme Court of New York in the
case of Rodman v. Munson, 13 Barb. 63, and to the court of Appeals
in Newell v. People, 7 N. Y. 9. In both cases it was held, after care-
ful consideration, and upon cogent reasoning, that the act authorized
the creation of a state debt within the meaning of the Constitution, and
this although the act in terms attempted to exempt the state from lia-
bility for any deficiency that might arise in the fund pledged for its
payment. In addition to other reasons, the act was held to violate
the Constitution in two respects: (1) It applied a part of the revenues
to the payment of interest, instead of to the completion work, and
(2) it authorized the contracting of a debt by the state in excess of the
state debt limit. Ruggles, Ch. J., in discussing the question whether
it created a state debt, used the following language, which meets our
full approval: 'It makes no difference whether the debt is contracted
on the general credit of the state or on the credit of a fund belonging to
the state. When the interest on a loan is raised by a tax it comes from
the pockets of the people individually, when it is paid out of a fund
belonging to the people, it is paid out of their common purse. In
respect to the profit and loss of the transaction, the objection is as
great to the one mode of borrowing as to the other. The chief object
of the restraint imposed by the twelfth section of article 7 of the Con-
stitution (the debt-limit section) upon the contracting of public debt
was to protect the people against the exhausting burden of paying in-
terest.' Johnson, J., in a concurring opinion, said: 'If language
has any meaning, the legal effect of the act, if valid, is at least to devote
so much of the surplus revenues of the canals as shall actually be re-
ceived after 1854 to the creation of a fund to pay the canal revenue
certificates and the interest thereon. If this can be done in regard to
one source of revenue, we see no reason why the same thing may not
be done in regard to every source of revenue of the state, including
not only all revenue which may arise from property, but also all which

may be realized by the exercise of the power of taxation.   Such an anticipation of revenue would no more create a debt than this bill does.   It may be objected that there is a distinction between a pledge of the revenues of property owned by the state and of the revenues to be derived from taxation; but the distinction does not affect the question.   Whatever consumes the revenues of the property of the state tends to render a resort to taxation necessary just to the extent to which the revenues from property have been consumed.   It is, therefore, a matter of entire indifference whether one or another part of the resources of the state is drawn upon; for the substantial effect upon the financial condition of the state is the same in either case.   If the constitutional provision against incurring debts permits such a scheme as this to be effectual, it is of small moment to inquire what it prohibits, for it provides no practical restraint whatever upon the power of the legislature.   To attribute such an intention to the convention or to the people as to permit the one and prohibit the other is to attribute them an entire incapacity to comprehend the subject on which they were acting, and the effect of their own language.   .   .   . State obligations assume every form which can tempt the possessor of money to part with it to the government, and are varied from time to time as one or the other seems most likely to accomplish the purpose of putting out promises and getting money in return.   In all these forms one common attribute is found, and one only, to-wit, that, in consideration of money advanced to the state, the state promises whatever it is that will be most likely to procure money to be advanced, it matters not what; and that which is thus promised is debt.   It may relate only to the income of particular property, or it may embrace the whole resources of the state.   The extent of the obligation does not affect or qualify its nature.   So long as there is an obligation assumed by the state, it constitutes a debt; something due from the state.'   We also quote from the concurring opinion of Edmunds, J.   Upon this point he said:   'It is said that it is not a debt, but merely anticipating the resources of the state as derived from the canals.   Now, it seems to me that all debt, whether by individuals or states, is merely an anticipation of resources.   Then, again, it is said that it is no debt because only a portion of the resources of the state are devoted to the repayment.   Does the fact that every householder has certain property that

**is** not liable for the payment of his debts destroy, or even change, the character of the obligation that rests upon him to repay money that he has borrowed? These, and such like suggestions, which were made to us on the argument, have not had the effect to persuade me that borrowing money is not contracting a debt.' The views of Brown, J., who wrote the opinion in Rodman v. Munson, supra, in which the same act was involved, are expressed in language equally clear: 'I cannot do otherwise than regard it as a loan—a loan of money to be repaid at a future day; not from the taxable property of the people of the state, or from the resources and revenues of the state generally, but qualifiedly and specially from that portion of its resources known as the "remainders of the canal revenues." ' There cannot be a loan of money without a lender and a borrower, and there cannot be a contract of lending without creating a debt and an obligation to repay in some form and to some extent. The time of repayment may be postponed to a distant day. The contract may provide that payment may be made in property, in current coin, or in a depreciated currency. It may be payable, as in the case of the canal certificates, from the proceeds of the income of certain specific property, but it remains a debt notwithstanding. The particular form or medium of payment, or the specific source from whence the means of payment is to be derived, may lessen or circumscribe the obligation of the debtor, but it cannot efface the obligation, or transform it into something which is to be recognized by another name, until the source from whence it is to proceed has failed, and the means of its payment is extinguished."

The court further cites with approval Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861 and Baltimore v. Gill, 31 Md. 375–390, and concludes, "we know of no cases in which the soundness of the reasoning of these cases has been questioned." In this connection see also Feil v. Coeur D'Alene, 23 Idaho, 32, 43 L.R.A.(N.S.) 1095, 129 Pac. 643; Leonard v. Metropolis, 278 Ill. 287, 115 N. E. 813; Lobdell v. Chicago, 227 Ill. 218, 81 N. E. 354; Voss v. Waterloo Water Co. 163 Ind. 69, 66 L.R.A. 95, 106 Am. St. Rep. 201, 71 N. E. 208, 2 Ann. Cas. 979; Palmer v. Albuquerque, 19 N. M. 285, L.R.A.1915A, 1106, 142 Pac. 929; Lesser v. Warren, 237 Pa. 501, 43 L.R.A.(N.S.) 839, 85 Atl. 839, note to Hagan v. Commissioners' Ct. 37 L.R.A.(N.S.) 1058.

It is urged by the defendants that the McMillan Case is not a con-
trolling authority for the reason that the statute and the facts differ
materially from those here involved. While there are some differences
in these respects it seems to us the reasoning of the McMillan Case is
apt in the instant case and that the New York and Illinois cases there-
in referred to and approved substantially parallel the instant case.
Defendants urge that in the instant case the income from the dormi-
tories of the several educational institutions never reaches the treasury
of the state but goes into special funds known as institutional funds
where it remains until it is disbursed. They contend that since this
is so and since any obligations resulting from contracts made by the
board of administration pursuant to the authority conferred by chapter
257 are payable only out of these special funds, therefore no debts
arise against the state on account of such contracts. To our minds
the fact that the dormitory income goes into the so-called institutional
funds and not into the state treasury can make no difference. Whether
paid into the treasury or not this income is, nevertheless, the property
of the state and is used in the support and maintenance of the several
institutions. A similar argument was advanced to sustain the validity
of the statute challenged in the McMillan Case. The court there an-
alyzed the contention and held that it could not be sustained; that so
long as the institutions were maintained and supported by the state
and taxation was resorted to, every dollar which was diverted from the
funds would have to be restored by taxation and, therefore, the obliga-
tion was in effect against the state and would be paid by the state. It
may be, but as to this we express no opinion, that the theory for which
the defendants contend in this respect would fit the case if no prop-
erty of the state, neither the sites nor the dormitory income, were con-
veyed or pledged and if the contracts made by the board of administra-
tion with the institutional building corporation were for the purchase
of dormitories erected on lands not belonging to the state, to be paid
for wholly out of the income from such dormitories so purchased. See
Winston v. Spokane, 12 Wash. 524, 41 Pac. 888; Joliet v. Alexander,
supra. But the defendants further urge in support of their contention
in this respect that in numerous other instances the legislature has
authorized contracts to be made which resulted in special limited obli-
gations payable only out of certain special funds and that such legis-

lation when attacked has been sustained by this court. They point to the Bank of North Dakota Act (Sess. Laws 1919, chap. 147), to the State Hail Insurance Act (Sess. Laws 1911, chap. 23, Sess. Laws 1919, chap. 160, Sess. Laws 1921, chap. 77), to the Bonding Act (Sess. Laws 1915, chap. 62), to the Soldiers' Bonus Act (Sess. Laws 1919, chap. 206, Special Sess. Laws 1919, chap. 55, Sess. Laws 1921, chap. 103, Sess. Laws 1923, chap. 244), to the Workmen's Compensation Act (Sess. Laws 1919, chap. 162), to the Guaranty Fund Act (Sess. Laws 1917, chap. 126, Sess. Laws 1923, chap. 200), and to various other acts authorizing the creation of funds by agencies of the state out of which certain payments shall be made, as instances where the obligations contemplated and authorized are as much subject to constitutional objection as the contracts of the board of administration which may be entered into pursuant to the provisions of chapter 257. We think, however, that there is a clear distinction between the several acts thus referred to by the defendants and the statute here in question. Here the institutional funds are the property of the state and, as heretofore stated, if used must be replenished through taxation. Excepting in the case of the Bank of North Dakota, the funds created under the acts pointed out by the defendants are special funds not the property of the state and created either through voluntary contributions or by involuntary exactions in the nature of special assessments. This court in the cases involving the several acts pointed to by the defendants has consistently recognized this distinction. Considering the Bank of North Dakota Act in the case of Sargent County v. State, 47 N. D. 561, 182 N. W. 270, we held that the Bank of North Dakota was an agency of the state; that though owned by the state it was not the state; that in functioning as it was authorized to function, it did so only at the hazard of its capital and not at the hazard of the public credit; that this capital was appropriated out of funds procured from bonds authorized and issued for that particular purpose pursuant to the provisions of § 182 of the Constitution, the section involved in the instant case. Considering the State Hail Insurance Act this court in State ex rel. Olson v. Jorgenson, 29 N. D. 173, 150 N. W. 565, in First Nat. Bank v. Olsness, 48 N. D. 758, 186 N. W. 751, and in Davis v. McLean County, 52 N. D. 857, 204 N. W. 459, held that the indemnity fund thereby created was

not a fund belonging to the state but consisted of voluntary contributions or payments by individuals who desired to enjoy the benefits of the protection thereby afforded. And we further held in State ex rel. Bauer v. Nestos, 48 N. D. 894, 187 N. W. 233, 619, that obligations issued by the Commissioner of Insurance on the security of this fund were payable only out of the moneys in the fund. Considering the Bonding Act, this court likewise held in the case of State ex rel. Linde v. Taylor, 33 N. D. 76, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583, that the fund thereby created was not a public fund; that the obligations that might arise under the act could be paid only out of moneys in the fund and, therefore, there was no obligation against the state. Considering the Workmen's Compensation Act our holding, in so far as it touched this point, was to the same effect. See State ex rel. Stearns v. Olson, 43 N. D. 619, 175 N. W. 714. Considering the State Fire and Tornado Insurance Act (Sess. Laws 1919, chap. 159, Sess. Laws 1925, chap. 154), our holding was the same. See Minot Special School Dist. v. Olsness, 53 N. D. 683, 45 A.L.R. 1337, 208 N. W. 968. Considering the Guaranty Fund Act this court in Wirtz v. Nestos, 51 N. D. 603, 200 N. W. 524, held that while the guaranty fund was a public fund created through the exercise of the taxing power for public or governmental purposes and controlled by a state agency in the public interest, it was analogous to a special assessment fund. This holding was based on the theory that the assessment to create the fund is analogous to a special assessment. Obligations payable out of special assessments have generally not been considered public debts within the meaning of the term "debt" as used in the constitutional prohibitions against incurring indebtedness. State ex rel. University & School Lands v. McMillan, 12 N. D. 280, 96 N. W. 310, supra; Vallelly v. Park Comrs. 16 N. D. 25, 15 L.R.A.(N.S.) 61, 111 N. W. 615; Quill v. Indianapolis, 124 Ind. 292, 7 L.R.A. 681, 23 N. E. 788; Dill. Mun. Corp. § 198, and cases cited. With respect to the Soldiers' Bonus Act this court has never been required to determine whether the legislature could properly authorize the issuance of certificates of indebtedness or other obligations based upon the security of the fund created under the act. The question was raised but not passed upon in the case of Bauernfeind v. Nestos, 48 N. D. 1218, 189 N. W. 506. However, the power to hypothecate the fund was there

denied. We know of no other instance where any question touching the point now under consideration has been raised or passed upon by this court. Thus we find no foundation in the decisions interpretive of these statutes which will sustain the defendants' present contention.

Finally, the defendants contend that no debt will be incurred contrary to the constitutional inhibition, for the reason that any contract that may be entered into by the board pursuant to the statute will require only annual payments which will be met during the several years of the contract out of the annual income from the dormitories. Defendants' theory in this regard is that under the contract there will be no present debt other than for the current installments; that as to future installments there will be no debt until the same fall due. We are unable to agree with them. The statute contemplates, regardless of the devices employed to accomplish its purpose or any disguises that it may wear, that the state shall procure dormitories to be erected for it. It further contemplates that it shall take over these dormitories immediately as they shall be built. It further contemplates that the state shall pay for these dormitories in installments as may be arranged, during a period not exceeding fifty years. The contract is not a contract for services to be performed in the future. It is a purchase of property which is immediately delivered. Nor is a mere future contingent liability created under it. Nor is the contract one entered into in anticipation of taxes already levied. It seems to us that the proposition thus advanced is answered adversely to the defendants by the case of Anderson v. International School Dist. 32 N. D. 413, L.R.A. 1917E, 428, 156 N. W. 54, Ann. Cas. 1918A, 506, and that nothing further need be said upon the matter. But see also Ottumwa v. City Water Supply Co. 59 L.R.A. 604, 56 C. C. A. 219, 119 Fed. 315; Windsor v. Des Moines, 110 Iowa, 175, 80 Am. St. Rep. 280, 81 N. W. 476.

We are thus forced to the conclusion that the contract authorized by chapter 257, and which the defendants are about to enter into pursuant to that statute, will result in a debt against the state within the meaning of the term "debt" as used in § 182 of the Constitution.

The plaintiff in his complaint alleges "that the state of North Dakota has reached the debt limit as provided by § 182 of the Constitution, and that any debt created under the provisions of chapter 257 will be

in excess of the constitutional debt limit and the current funds of the state raised by taxation or otherwise." This the demurrer admits. Furthermore, chapter 257 authorizes contractual obligations that will run for a period of fifty years. Clearly § 182 of the Constitution contemplates that no debt shall be incurred unless evidenced by a bond issue, nor for a longer term than thirty years. So it is beyond question that the contract, which the plaintiff alleges the defendants are about to enter into, will result in a debt which they cannot be authorized to contract, and that the statute contravenes the constitutional prohibition. Therefore on this account, as well as on account of its violation of the provisions of § 25 of the Constitution, chapter 257 must be held unconstitutional and void. While other grounds are urged by the plaintiff in support of his challenge to the statute, it is unnecessary for us to pass upon them in view of our holding as heretofore expressed.

The district court erred in sustaining the demurrer to the complaint and the order made in that behalf therefore must be and it is reversed.

BURKE, BURR, and CHRISTIANSON, JJ., and McKENNA, Dist. J., concur.