[File No. 6663.]

BRADLEY C. MARKS, F. L. Conklin and E. L. Williams, Appellants, v. CITY OF MANDAN, NORTH DAKOTA, a Municipal Corporation, et al., Respondents.

ADA S. STUTSMAN, Intervener and Respondent.

(296 N. W. 39.)

476

Opinion filed January 6, 1941. Rehearing denied February 6, 1941.

L. J. *Palda, Jr.,* and *C. L. Young,* of Bismarck, for appellants.
*John F. Sullivan, J. P. Fleck,* and *C. F. Kelsch,* for respondents.
*W. H. Slutsman,* for intervener and respondent.

MORRIS, J. The plaintiffs in this action are the owners and holders of a special assessment warrant issued by the city of Mandan in connection with the payment of the costs of construction of a sewer system in sewer district No. 6 of that city.

The warrant is dated November 13, 1930, in the sum of $150, and is payable on the 13th day of November, 1939. It bears interest at the rate of 7 per cent per annum, payable semiannually.

The warrant contains, among others, the following provision: "The faith and credit of the city of Mandan, North Dakota, are hereby irrevocably pledged to levy the special assessments for the total cost of the improvement on account of which this warrant is issued, to cause the same to be collected and paid into the said fund applicable to the payment thereof, to levy a tax upon all taxable property of the city for the payment of any deficiency which may exist in said fund upon the maturity of all warrants of this series, and to cause each step authorized by law to be taken for the punctual payment of the principal and interest of this warrant at maturity."

By this proceeding the plaintiffs by mandamus seek to compel the city of Mandan to levy a general tax upon all the taxable property within the city to pay a deficiency which now exists in the fund on which this warrant is drawn. This deficiency arose because of the failure of certain property owners to pay the special assessments levied against their property. The financial condition of the city at any time is not disclosed; and no question is raised involving § 183 of the Constitution of North Dakota, which prescribes debt limits for municipalities.

At the time the warrant in this case was issued, § 3716, N. D. Comp. Laws 1913, had been amended by chapter 174, N. D. Session Laws 1923, and again amended by chapter 171, N. D. Session Laws 1929. Both the 1923 and 1929 amendments contain this provision: "When-

ever all special assessments collected for a specific improvement are insufficient to pay the special improvement warrants issued against such improvement with interest, the city council or city commission, as the case may be, shall upon the maturity of the last special improvement warrant, levy a tax upon all the taxable property in the city for the payment of such deficiency."

Prior to its amendment, § 3716 provided that "whenever all special assessments levied for a specific improvement shall have been collected and applied in payment of the warrants issued for such improvement, and a deficiency remains, the city council shall levy a tax upon all the taxable property in the city for the payment of such deficiency."

In case No. 1, ante, 434, 296 N. W. 34, involving warrants issued prior to the amendment, we hold that no duty devolves upon the city to levy a general tax to pay a remaining deficiency until all special assessments levied for the specific improvement for which the warrants in question were issued have been collected and applied. In that case it appeared that the special assessments had not all been collected. Consequently, the condition precedent to the right to levy the general tax had not been met. Section 3716, in its original form, does not provide for the levy of a general tax to pay deficiencies growing out of the failure of property owners to pay their special assessments.

This case involves the effect of the amendments of 1923 and 1929. In determining the effect of the amendments, we again examine the statute to determine what the intention of the legislature was. The very fact that the legislature amended the statute and drastically changed its wording indicates with certainty that the legislature intended to change the meaning of the statute.

A city may become generally liable upon special improvement warrants unless the statute forbids. Pine Tree Lumber Co. v. Fargo, 12 N. D. 360, 96 N. W. 357; Dakota Trust Co. v. Hankinson, 53 N. D. 356, 205 N. W. 990. It follows that the legislature may by statute render the city liable either generally or for certain deficiencies arising in special assessment funds.

Prior to the enactment of chapter 62, N. D. Session Laws 1905, of which the original § 3716 was a part, the plan of making special improvements provided by the statute was such as to "enable a city to make special improvements upon its streets, and to reimburse itself for

the cost of the same through special assessments of property abutting upon and benefited by the improvements, to the extent of assessments made, and this without cost to the general taxpayer." Pine Tree Lumber Co. v. Fargo, 12 N. D. 360, 96 N. W. 357.

In that case, however, it was further said: "The paving of its streets was a municipal improvement contracted for by the city, and, when completed, of general utility. Unless there is something in the general incorporation act or general statutes which otherwise directs, or by necessary implication limits the right of a city to become generally liable upon its contracts for this class of improvements, or something in the contract with the city by which the claimant is limited in his recovery to the special funds to be raised from the assessment of abutting property, we can see no reason why the city cannot be held generally liable for debts it has thus contracted."

The above case was decided in 1903. In 1905 the legislature passed chapter 62 of the Session Laws of that year, whereby it set up a new system providing for special improvements.

Concerning this chapter, we said in Schieber v. Mohall, 66 N. D. 593, 609, 268 N. D. 445, 453, that "there is nothing plainer in the whole chapter than that the city is not to be held responsible generally for the cost of the improvement. The cost is to be paid by the property benefited, from a fund raised by taxation of said property, and from no other source." See also Bankers Trust & Sav. Bank v. Anamoose, 51 N. D. 596, 200 N. W. 103. That was the law prior to the amendment of § 3716 by chapter 174, N. D. Session Laws 1923.

A number of constitutional questions have been raised. It is urged that if the statute in question be construed so as to render the city generally liable for deficiencies in its special improvement funds, and to authorize the levy of a general tax for the payment of such deficiencies, it violates § 13 of the North Dakota Constitution, and § 14 of the United States Constitution. These sections embrace what is generally known as the due process of law clause.

In support of this contention, it is urged that the tax is levied for a private purpose; and further, that the general taxpayer has had no notice or opportunity to be heard regarding the validity or the extent of the tax to be imposed upon his property.

In considering this same objection to the levy of a general tax to

create a revolving fund to pay delinquent assessments on property purchased by a city at a delinquent assessment sale, the supreme court of California, in the case of American Co. v. Lakeport, 220 Cal. 548, 560, 32 P. (2d) 622, 627, said: "The theory is that if all the property owners in the city are to be taxed to meet the delinquent assessments, those outside the district are, in effect, being subjected to an assessment in the guise of a tax; and that such an assessment is invalid where they have had no notice or hearing as to any benefits which they are to derive from the particular improvement. The conclusion of the lower court that the tax was, in fact, an assessment, is unwarranted. The overwhelming weight of authority supports such a tax on two chief grounds: First, where a tax is imposed upon all property without regard to benefits received, it is a tax and not a special assessment, regardless of its purpose; and second, where a general tax is levied to meet delinquencies in assessments for local improvements, there is no necessity for notice and hearing."

It may also be observed that the general tax is to be imposed by the same authority that imposes other general taxes of the city. This authority consists of the officers duly chosen by the electors of the city and authorized by the statute to act for the city. Certainly it cannot be contended that "due process" requires each taxpayer to be individually consulted relative to the levying of a tax of a general nature upon his property.

It is further urged that the levy of special assessments based upon benefits and a subsequent general levy to take care of deficiencies constitutes double taxation, at least as against those taxpayers who have paid their special assessments. This question was considered at length in Klemm v. Davenport, 100 Fla. 627, 129 So. 904, 70 A.L.R. 156. In that case it was held that although special assessments had been imposed to pay the obligation of a municipality arising out of the issuance of bonds for street improvements, a taxpayer may also be required to pay an additional amount to make up deficiencies caused by the neglect or inability of other taxpayers to pay their assessments; and that the imposition of an ad valorem tax to make up such deficiencies does not impinge on constitutional inhibitions against double taxation or the requirement of equality and uniformity; and that such ad valorem taxes do not amount to the taking of property without due process.

Another constitutional objection urged is that if the statute in question is construed to permit the levy of general taxes to pay special assessment deficiencies, it violates § 185 of the North Dakota Constitution, which prohibits cities from loaning or giving their credit to, or making donations to or in aid of any individual, association, or corporation, except for the reasonable support of the poor.

An examination of the books discloses that this question has also been passed upon by other courts. Stanley v. Jeffries, 86 Mont. 114, 131, 284 P. 134, 138, 70 A.L.R. 166, involved the constitutionality of a statute empowering a municipality to levy a general tax to create a revolving fund for the purpose of securing the prompt payment of special improvement district bonds or warrants. The court says:

"But the laying out and improvement of streets, alleys, sewers and the like is essentially a public purpose benefiting the entire community, although the work is done in but a portion of the city, and, in the absence of any legislative restriction, each portion of the city might be thus improved at the general public expense, and no taxpayer could be heard to complain thereof. In other words, in order to erect any public improvement by the creation of special improvement districts, both general benefits to the municipality and special benefits to particular property must be conferred—the special benefit to adjacent property is but incidental to the general benefit to the city; it could not otherwise lawfully be created.

"When, therefore, the legislature provided that, as to special improvement districts created in the future, a fund shall be created to insure the prompt payment of bonds and warrants issued in payment of such improvements, it but modified the special improvement district law to impose upon the general public, within the municipality, a conditional obligation to pay a small portion of the cost of erecting the public improvement, whereas it might have, lawfully, imposed a much greater burden upon the municipality."

It is urged that the case of Martin v. Tyler, 4 N. D. 278, 60 N. W. 392, 25 L.R.A. 838, is applicable to and decisive of the constitutional validity of the statute in question. Martin v. Tyler, supra, has both points of similarity and points of difference when compared with the situation now before us. In that case, "An act to provide for establishing, constructing and maintaining drains in this state" was held to be

violative of § 185 of the Constitution. That statute provided for the appointment of a drain commission and vested in it the powers of the act. The members of the commission were required to take an oath of office and give a bond. It provided for levying assessments on lands benefited, for the payment of the cost of constructing drains, and provided that the assessments must equal the entire cost of the drain with 10 per cent added to cover contingencies, which must be levied and collected in one year. Another section provided for the issuance of bonds by the county, the proceeds of which were turned over to the drainage commission to defray the cost of the ditches. Special assessments were then to be divided into as many parts as the bonds had years to run, and one part collected each year. The proceeds of the assessments were to be placed in a sinking fund for the payment of the bonds and interest. The court held that this latter section violated § 185 of the Constitution, and said: "By this means the payment, which must otherwise be made in one year, may be extended over twenty years. This indulgence to the corporations and persons benefited and specially assessed is obtained by means of the credit of the county. Its bonds are issued under the drainage act, and must so state on their face. The proceeds of the bonds go, not into the control of the county commissioners, but at once into the drainage fund, controlled exclusively by the drain commission . . . no refinement of construction or technical rule of law can make this transaction less than a loan of credit of the county to the parties primarily liable for the cost of the drain."

It was further held that the burden was placed by the act upon the property owners to pay for the drain, and that "all the county can do is to obtain for them an extension of the time of payment by the loan of its credit." The question of whether the county could have used public funds for constructing the drainage ditches in whole or in part was not presented, and was not considered by the court in that case. Neither does the court decide whether the construction of the drainage ditches is a public purpose. Under the statute considered in that case, the construction of drainage ditches was placed under the jurisdiction of and collection was made by the board of drainage commissioners and not the board of county commissioners, who are the regularly constituted governing body of the county. The county issued its bonds and raised

the money. The money was turned over to and spent by the board of drainage commissioners.

Under the statute before us, we find that although special assessments may be levied upon property to pay in the first instance for the improvements in question, those improvements are contracted for and the assessments levied by the governing body of the city and its fiscal agents. Separate officers are not provided for the improvement districts. Although the city is not generally liable on contracts for special improvements, "All contracts entered into for any work, provided for in this article shall be entered into in the name of the city." Comp. Laws 1913, § 3709. The improvement districts are represented by no special board or commission, and the cost of the improvement may be paid in the first instance partly by general taxation. The purpose, as we have heretofore pointed out, is a public purpose. The fact that special benefits may be derived by and special assessments levied upon private property does not destroy this public purpose. Since the county could have created this improvement from its public funds and levied taxes therefor on the basis of a public purpose, it follows that the expenditures of public funds for such a purpose, even upon the happening of a contingency, is not forbidden by § 185 of the Constitution. In the Tyler Case, the legislature determined that in the first instance, private property benefited by the drain must pay for the cost of the drain. Ten per cent was added to the estimated cost to cover contingencies. All this was to be paid in one year, but as the court said, this might often prove a hardship, so it was provided that the county might lend its credit even though the county, as such, had nothing to do with the project. Such a loan of credit was held to be a violation of the Constitution. There was no question of contingent liability on the part of the county. Through its credit it issued the bonds and paid for the drain in the first instance. The property owners paid the county back. In the case of the statute now before us, the city issued warrants which it required the property owners who are benefited by the improvement to pay through property assessments, but these assessments did not constitute a personal liability. Special assessments are not the personal obligation of the owners of the property assessed. They are merely liens thereon. Even in the absence of any agreement on the part of the city to

become contingently liable for the deficiency, the city, merely by the negligence of its officers, may become liable on the warrants. Pine Tree Lumber Co. v. Fargo, 12 N. D. 360, 96 N. W. 357; Dakota Trust Co. v. Hankinson, 53 N. D. 356, 205 N. W. 990. The statute we are considering broadens the liability from one of a special contingency to that of a general contingent liability for any deficiency whatever the cause.

The differences of statute and fact between the Tyler Case and the one at bar rob the Tyler Case of controlling force with respect to the situation now before us. The expenditure of money raised by general taxation in the payment of deficiencies resulting in funds set apart to pay special assessment warrants does not constitute a donation, nor does the obligation to levy such a tax amount to a loan of credit by the city in violation of § 185 of the state Constitution.

The fact that the city has determined that certain benefits have accrued to private property, does not preclude the existence of general benefits or their recognition in the form of a contingent liability. "There is hardly any so called special improvement which does not redound to the benefit of the whole community, if, indeed, it benefits anyone at all." Robertson Lumber Co. v. Grand Forks, 27 N. D. 556, 147 N. W. 249.

Whether the expense of making special improvements shall be paid out of the general fund of the city or be assessed in whole or in part against property specially benefited is primarily a question of legislative expediency. Dillon, Municipal Corporations, 5th ed. §§ 1431, 1439.

The various arguments advanced as to the unconstitutionality of a statute requiring the levy of a general tax to meet deficiencies resulting from the failure of special assessment collections lose their virility when we consider that we are dealing with the question of legislative power under the Constitution, in light of the unquestioned fact that the legislature might have provided for the payment of the type of improvement involved in this case by general taxation without notice or hearing as to individual benefits resulting from the improvement. The legislature might have authorized municipalities to incur a general primary indebtedness for the purpose of creating such an improvement. It therefore follows that the legislature may provide for

these local improvements to be paid for, in whole or in part, by general taxes; or to be paid primarily by special assessments, with a provision to care for deficiencies by general taxation, as it did by the 1923 amendment.

·. This general power of the legislature to so provide is recognized in many cases, including the following: State ex rel. Bowman v. Allen County, 124 Ohio St. 174, 177 N. E. 271; Wicks v. Salt Lake City, 60 Utah, 265, 208 P. 538; Comfort v. Tacoma, 142 Wash. 249, 252 P. 929; Crescent City v. Moran, 25 Cal. App. (2d) 133, 77 P. (2d) 281; Dinneen v. Rider, 152 Md. 343, 136 A. 754; Stanley v. Jeffries, 86 Mont. 114, 284 P. 134, 70 A.L.R. 166; Klemm v. Davenport, 100 Fla. 627, 129 So. 904, 70 A.L.R. 156, and American Co. v. Lakeport, 220 Cal. 548, 32 P. (2d) 622—supra.

As was said in Pine Tree Lumber Co. v. Fargo, 12 N. D. 360, 96 N. W. 357, supra, the paving of streets is of general utility. It may also be said that the construction of a sewer system is of general utility to the entire population of the city. The easy and sanitary disposition of sewage afforded by a sewage system is conducive to the health and comfort of the general population of the city, even though the ·more direct and proximate benefits accrue to the owners of property abutting on the sewer mains. The power to construct and maintain sewers is conferred by the legislature. Comp. Laws, N. D. 1913, §§ 3697 and 3702. This power should receive a liberal construction in favor of the municipality. McQuillin, Municipal Corporations, § 1545.

The question of the extent to which the city may go in bearing the expense of such a system through general taxation lies within the field of legislative discretion; and its reasonable exercise, even to the extent of permitting or requiring the city to assume certain deficiencies that may arise in the collection of assessments levied against private property, does not invade constitutional rights of general taxpayers of the city.

One more important constitutional objection remains to be considered. It is whether the statute is violative of § 184 of the state Constitution. This section provides that "any city, county, township, town, school district, or any other political subdivision incurring ·indebtedness shall at or before the time of so doing, provide for the

collection of an annual tax sufficient to pay the interest and also the principal thereof when due, and all laws or ordinances providing for the payment of the interest or principal of any debt shall be irrepealable until such debt be paid."

This section is mandatory. The legislature cannot authorize cities to do that which the Constitution forbids. It is contended that the statute in question creates a liability upon the city to pay deficiencies which may rise in special assessments; that the liability is created at the time of the issuance of the warrants, and since no provision is made for the levy of a tax until a deficiency occurs, § 184 is thereby violated.

Under chapter 174 when the warrants are issued a contingent liability is created which may develop into an absolute liability upon the happening of a contingency, i. e., a deficiency in the fund against which the warrants are issued at the time the last warrant matures. The appellants contend that the liability thus created, being contingent, does not constitute an indebtedness within the meaning of § 184 until the happening of the contingency. There is no question but that the liability of the city at the time of the issuance of the warrants is contingent. Thus we are met with the proposition as to whether this liability is an indebtedness of the city within the meaning of § 184 from the beginning or does it become an indebtedness only when and if the contingency occurs. This specific question has never been directly passed upon in this jurisdiction. Some questions concerning obligations that come within the provisions of §§ 182 and 183 of the Constitution, being debt limit sections, have been considered in other cases. In State ex rel. University & School Lands v. Mc-Millan, 12 N. D. 280, 96 N. W. 310, this court passed upon the constitutionality of an act which authorized the issuance of bonds for the purpose of procuring funds to erect and equip buildings for the State Normal School at Valley City, and appropriated a sufficient portion of the interest and income from land grant funds allocated to the support of the institution to pay the principal and interest of the bonds. The law further provided that "if there shall not be sufficient money in each of the said funds to pay such interest there is hereby appropriated a sufficient amount to meet such deficiencies."

The court held the act to be invalid, saying: "Its violations of the

following provisions of the Constitution are manifest: (1) It authorizes the creation of a state debt in excess of the debt limit and contrary to § 182 of the Constitution; (2) it authorizes the creation of a state debt, and contains no provision 'for levying an annual tax sufficient to pay the interest semi-annually and the principal within thirty years,' contrary to the requirements of the section last referred to."

In Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156, the court considered the constitutionality of an act which authorized the state board of administration to convey for terms not exceeding fifty years to institutional holding associations, sites for dormitories at various educational institutions. The associations were authorized to construct dormitories on these sites and issue bonds to procure the necessary funds. To secure the payment of these bonds, the associations were authorized to mortgage the property and pledge the rentals. In holding the act violative of § 182 of the Constitution, the court said: "Though the statute provides that the state shall incur no liability by reason of anything that may be done by the board under the authority thus conferred, and though no bonds of the state are issued, nevertheless the fact remains that the property of the state is mortgaged and pledged and to that extent there is an obligation to pay on the part of the state. Thus it seems to us there is created a debt within the meaning of that term as used in the constitutional prohibition. In our judgment the case of State ex rel. University & School Lands v. McMillan, 12 N. D. 280, 96 N. W. 310, by its reasoning and its approval of the doctrine of the cases therein cited is conclusive on this question."

A later case (State ex rel. Kaufman v. Davis, 59 N. D. 191, 229 N. W. 105) involved another legislative act providing for the construction of dormitories. That act was held to be so different from the one involved in Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156, supra, that it was not governed by that case and did not violate § 182 of the Constitution.

In Lang v. Cavalier, 59 N. D. 75, 228 N. W. 819, the court held that a city does not create an indebtedness within the purview of § 183 of the North Dakota Constitution by entering into a contract to purchase and install equipment for a public utility where such con-

tract provides that the obligation created is payable only from the net revenues of the utility, and no general obligation of the city is entailed. The court said: "In the instant case, however, a consideration of the contract discloses that no property of the city is pledged. No money derived from taxation is to be used in building up the special fund out of which the pledge orders are to be paid. It is true that this fund is created out of the receipts arising from the operation of the plant which was purchased, but it seems to us that the fund is at least analogous to a special assessment fund, and the obligation to be paid may be likened to a special assessment obligation. This court has heretofore held that obligations payable out of special assessments are not considered public debts within the meaning of the term debt as used in the constitutional prohibitions against incurring indebtedness. See Wilder v. Murphy, supra; State ex rel. University & School Lands v. McMillan, 12 N. D. 280, 96 N. W. 310, supra; Vallelly v. Park Comrs. 16 N. D. 25, 111 N. W. 615, 15 L.R.A. (N.S.) 61. The purpose of the provision as contained in section 183 of the Constitution limiting the debt of certain municipalities 'is to prevent such municipalities from improvidently contracting debts for other than ordinary current expenses of administration, and to restrict their borrowing capacity.' Anderson v. International School Dist. 32 N. D. 413, 156 N. W. 54, L.R.A.1917E, 428, Ann. Cas. 1918A, 506. Such provisions are intended 'to serve as a limit to taxation and as a protection to taxpayers.' 6 McQuillin, Municipal Corporations, 2d ed. § 2364. There is nothing inconsistent with these purposes in the contract made by the city of Cavalier with the Fairbanks-Morse Company."

The holding in this case was later approved in Thomas v. McHugh, 65 N. D. 149, 256 N. W. 763. The decisions in these cases are in accord with the great weight of authority as disclosed by notes found in 72 A.L.R. 687 and 96 A.L.R. 1385.

In Vallelley v. Park Comrs. 16 N. D. 25, 111 N. W. 615, syllabus 1 states: "Debts of a city contracted for paving and sewer purposes are not to be computed in ascertaining whether the debt limit has been exceeded. There is no general liability against the city for such indebtedness, except for the one-fifth portion of the cost of paving."

From the foregoing cases it may be said that North Dakota has

adopted what is generally termed as the "special fund" doctrine as applied to the obligations incurred by municipalities or the state itself with regard to special assessment funds for paving and sewers, contracts for the purchase of electric light plants and the erection of dormitories at state educational institutions. This doctrine may be stated as an established rule of law. It is that, bonds, warrants, contracts, or other obligations issued or entered into by the state, or its municipalities, when specially authorized by statute, do not come within the meaning of the words "debt" or "indebtedness" as used by the debt limitations provisions of the Constitution if these obligations are secured by and payable exclusively from revenues to be realized from public property acquired with the proceeds of the obligations or assessments on private property benefited by the special improvements.

This rule is clearly applicable to the word "indebtedness" as used in § 184 of the Constitution. If the obligations are to be paid only from special funds, it would be wholly superfluous to also require the levy of an annual tax under the provision of this section of the Constitution. Payment of the obligations having been provided without resort to general taxation, they are not such obligations as are contemplated by that section.

The next step in our consideration of this matter springs from the situation that arises when provision is made for a special fund which on its face is or will be adequate to pay the obligations in full and in addition thereto the law also provides that if the special fund should prove insufficient, the deficiency shall be made up by the levy of a general tax.

The question of the validity of a contingent liability in excess of the debt limit of a city arose in Bismarck Water Supply Co. v. Bismarck, 23 N. D. 352, 137 N. W. 34. In connection with a franchise to lay water mains and pipe, the city agreed that in event of a change in the grade of the street or highway, that might necessitate a lowering of the mains, the city would reimburse the water supply company for the expense of such a change. The city contended that it thereby incurred an indebtedness in violation of the constitutional debt limit prescribed by § 183 of the Constitution. In rejecting that contention, the court said: "The contention of appellant, to the effect that by the

contract in question, the defendant city undertook to bargain away a part of its governmental powers, is, we think, for the foregoing reasons, without merit. Nor do we deem its contention sound, to the effect that by such contract the city incurred an indebtedness in excess of the constitutional debt limit. The presumption is in favor of the validity of the acts of the defendant's officers. Furthermore, the answer sets forth no sufficient facts as a basis for this attempted defense. No indebtedness was incurred by the ordinance and contract in question in so far as expenses such as those here sued for are concerned. As to this feature of the contract the defendant city merely incurred a contingent future liability." Generally speaking, the special fund doctrine does not permit the fund to be fed from general or other revenues in addition to those arising from the specific improvement contemplated. Garrett v. Swanton, 216 Cal. 220, 13 P. (2d) 725. This limitation, however, is subject to an exception that has been recognized in a number of cases. The exception is based upon the theory of Bismarck Water Supply Co. v. Bismarck, supra. Where the obligation of the municipality rests wholly upon a contingent liability, there is no debt created until the contingency occurs.

In Comfort v. Tacoma, 142 Wash. 249, 252 P. 929, the court had before it a statute relating to the creation of a fund whereby the city guaranteed local assessment bonds by accepting unpaid bonds from the holders and levying a tax therefor. One of the questions raised was whether bonds issued under these provisions of the law became a debt of the city, for if they were, they would increase the debt of the city beyond the statutory debt limit without a vote of the people; and the statute authorizing their issuance would be unconstitutional. The amount that could be levied for the guaranty fund in any one year was limited to 5 per cent of all outstanding local improvement bonds. The court reached the conclusion that the statute created "only a contingent liability as far as the city is concerned, and in no sense a debt proper." The constitutionality of the same statute was again challenged upon the same grounds in Kelly v. Sunnyside, 168 Wash. 95, 11 P. (2d) 230, and the court adhered to its holding in the former case. In Lillard v. Melton, 103 S. C. 10, 87 S. E. 421, it was held that the liability of the city of Columbia for interest on Columbia Canal bonds guaranteed by it and for certain paving assessments

which the city had guaranteed constituted but a contingent obligation and must be excluded in determining whether a proposed bond issue would cause the indebtedness of the city to exceed its constitutional debt limit. Likewise, it was held in Brownlee v. Brock, 107 S. C. 230, 92 S. E. 477, that paving assessment certificates sold and guaranteed by the city must be excluded in computing the bonded debt of the city. Upon the authority of these two cases, it was held in McIntyre v. Rogers, 123 S. C. 334, 116 S. E. 277: "The guaranty of the paving certificates may not be regarded as a part of the 'bonded debt' or 'bonded indebtedness' of the town, within the meaning of the constitutional inhibition."

In American Co. v. Lakeport, 220 Cal. 548, 32 P. (2d) 622, it is said: "The rule that the inhibitions of the constitutional debt limit do not apply to contingent obligations has long been settled in this state."

The theory of contingent liability enters into the determination of what constitutes municipal indebtedness in Wicks v. Salt Lake City, 60 Utah, 265, 208 P. 538, and Corey v. Ft. Dodge, 133 Iowa, 666, 111 N. W. 6.

In South Dakota a contingent liability of the state has been held not to create an indebtedness of the state until the happening of the contingency. In Re Opinion of Judges, 38 S. D. 635, 162 N. W. 536, involved the constitutionality of an amendment to the Rural Credits Act. The amendment provided for the levy of a special tax to take care of deficiencies that might occur in the rural credits fund. The court held that the amendment only designated a contingency under which a debt against the state would arise, and that unless the contingency happened, there was no debt.

In Coles County v. Goehring, 209 Ill. 142, 70 N. E. 610, the supreme court of Illinois considered the validity of a contract for the repair of a court house. The contract provided for the payment of certain installments as the work progressed. It was contended that the contract created an indebtedness within the meaning of § 12 of Article 9 of the Illinois Constitution which provided that: "No county, city, township, school district, or other municipal corporation, shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggre-

gate exceeding 5 per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes, previous to the incurring of such indebtedness. Any county, city, school district, or other municipal corporation, incurring any indebtedness as aforesaid, shall before, or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same."

A striking similarity exists between the wording of the last part of the above quotation and our own § 184. In holding that this section of the Illinois Constitution did not apply to the contract in the Coles County Case, the court said: "It is said, however, by counsel for plaintiff in error, that, under the second sentence of § 12 of article 9 of the Constitution, the county, before or at the time of making the contract, should have provided for the collection of a direct annual tax sufficient to pay the interest on the debt incurred by the making of the contract, as it fell due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same. We have held that the second sentence of § 12 'has reference to indebtedness, the amount whereof has become fixed and absolute, and the payment thereof deferred to a stated period in the future.' Danville v. Danville Water Co. 180 Ill. 235, 54 N. E. 224; Kankakee v. McGrew, 178 Ill. 74, 52 N. E. 893."

In § 2332, McQuillin on Municipal Corporations, 2d ed., we find this statement, "Some of these constitutional and statutory provisions are that no debt shall be incurred by a municipality unless provision is made at the time for levying and collecting a sufficient tax to pay the interest thereon and provide at least a certain per cent as a sinking fund. These provisions, however, in most states, refer only to interest bearing indebtedness payable at a fixed time in the future, although the form of the indebtedness is immaterial." See also Dillon on Municipal Corporations, 5th ed. § 211.

The warrant upon which this suit is brought was issued by the city of Mandan against a special fund created by the levy of assessments against the property benefited. Thus the city provided a means of payment which, according to reasonable expectations, would

be sufficient to produce the amount required to pay the warrant and interest thereon according to its terms. ⸳ The statute provided that in event this means should not be sufficient, the city would levy a general tax for any deficiency that might exist at the time of the maturity of the last warrant that had been issued against the fund. The city did not become obligated to make the levy until and unless two things happened: the last warrant matured and a deficiency in the fund existed. There was no way to measure the amount of the deficiency until the contingency thus provided for occurred. When it did occur it became a liability of the city, definite in amount. The statute provided for levying a tax at that time, to care for the indebtedness thereby created. Thus the statute complies with § 184 of the Constitution which requires the levy of an annual tax at or before the time of incurring the indebtedness.

Having determined that the legislature might constitutionally impose upon a municipality the obligation to levy general taxes to pay deficiencies arising in special assessment funds, the remaining question, therefore, is: Did the legislature so provide by its amendments to § 3716?

This question can best be answered by recurrence to the statute itself. Its wording is not ambiguous. Prior to its enactment, the city had not been permitted to levy general taxes to pay deficiencies in special assessment funds until all special assessments levied for the specific improvement had been collected and applied in payment of outstanding warrants.

The amendment drastically changed the pre-existing law. It requires that when all special assessments collected are insufficient to pay the special improvement warrants issued against a specific improvement, the city shall levy a general tax to pay the deficiency. In order to remove any uncertainty as to when the obligation to levy this tax accrues, the legislature was specific. It provided that this should be done "upon the maturity of the last special improvement warrant."

It is also significant that while the legislature first obligated municipalities to levy the tax in question in 1923, it amended the law again in 1929, keeping intact the provision requiring the levy of the tax upon the maturity of the last special assessment. warrant. The leg-

islature then further provided that prior to the maturity of the last special improvement warrant, the proper city authorities may in their discretion levy such a tax, if a deficiency exists in a special assessment fund prior to maturity of the last warrant.

It appears that the legislature provided that the city should levy the tax which the plaintiffs seek. This is the plain import of the 1923 amendment, reiterated by the legislature in chapter 171, N. D. Session Laws 1929, which was in effect at the time the warrant in this case was issued.

The constitutionality of chapter 174, N. D. Session Laws 1923, is further challenged upon the ground that the subject of the act is not sufficiently expressed in its title to meet the requirements of § 61 of the North Dakota Constitution. As we have heretofore pointed out, § 3716, N. D. Compiled Laws 1913, was originally enacted as a part of chapter 62, N. D. Session Laws 1905, dealing with the organization and government of cities.

The 1923 amendment is entitled "An Act to Amend and Re-enact § 3716 of the Compiled Laws of 1913 Relating to Payment of Deficiency in Special Assessments." It is argued that the title of the act deals with deficiencies in special assessments and not with deficiencies resulting from nonpayment or failure to collect. We think the attempted distinction is entirely too narrow. Both the original section and its amendment deal with deficiencies in special assessment funds. These funds are created to care for the cost of special improvements within the municipalities. Both the original section and the amendment provide for the levy of a general tax to pay deficiencies. The amendment is broader in scope than the original section in that it permits the levy of a general tax to make good deficiencies resulting from the failure of property owners to pay their assessments. The title to an amendment, however, need not point out with particularity the exact scope of the amendment. Where the title to an amendatory act indicates that it is an amendment to an act or section specified therein, the title is sufficient, provided that the subject matter of the amendment is germane to the subject of the act that is amended and is embraced within the scope of the title of the act amended. Erickson v. Cass County, 11 N. D. 494, 92 N. W. 841; State v. Fargo Bottling Works Co. 19 N. D. 396, 124 N. W. 387,

26 L.R.A.(N.S.) 872; School Dist. v. King, 20 N. D. 614, 127 N. W. 515; Wilson v. Fargo, 48 N. D. 447, 186 N. W. 263; Spicer v. Benefit Asso. R. E. 142 Or. 588, 17 P. (2d) 1107, 21 P. (2d) 187, 90 A.L.R. 517; Great Northern R. Co. v. Whitfield, 65 S. D. 173, 272 N. W. 787, 111 A.L.R. 1475.

The amendment is germane to the purpose of the original section. That purpose is to require the levy of a general tax to make good deficiencies in special assessment funds. These funds contain the proceeds of special assessment collections. Warrants have been issued against the funds; and the special improvements, which are the bases of the special assessments, have been paid for by the proceeds of the warrants. The amendment broadens the causes of deficiency for which the general tax may be levied so as to include failure to collect assessments. This is not such a departure from the purpose of the original section as to destroy the relevancy of the amendment thereto; nor does this departure place the amendment beyond the scope of the title to the Act of which the amended section originally was a part. The 1923 amendment is not invalid as violative of § 61 of the North Dakota Constitution.

Reversed.

BURKE and NUESSLE, JJ., concur.

CHRISTIANSON, J. (dissenting in part). I agree with the opinion prepared by Judge Morris, with the exception of that portion of the opinion that deals with § 184 of the Constitution of North Dakota. I dissent from the holding that the liability which chapter 171, Laws 1929, imposes upon a city that issues special improvement warrants, for any deficiency that may exist in the special fund against which the warrants are drawn upon the maturity of the last warrant, does not constitute an indebtedness of the city within the meaning of § 184 of the Constitution. In my opinion the effect of said chapter 171, Laws 1929, is that a city "incurs an indebtedness," within the purview of said § 184 of the Constitution, when it issues a special improvement warrant.

Section 184 of the Constitution provides: "Any city, county, township, town, school district, or any other political subdivision incur-

ring indebtedness shall at or before the time of so doing, provide for the collection of an annual tax sufficient to pay the interest and also the principal thereof when due, and all laws or ordinances providing for the payment of the interest or principal of any debt shall be irrepealable until such debt be paid."

The city of Mandan issued certain special improvement warrants to pay for the construction of a sewer system. Each of the warrants contained a provision pledging the faith and credit of the city to levy special assessments for the total cost of the improvement, cause the same to be collected and paid into the fund applicable to the payment of such warrants, and further "to levy a tax upon all taxable property of the city for the payment of any deficiency which may exist in said fund upon the maturity of all warrants of this series, and to cause each step authorized by law to be taken for the punctual payment of the principal and interest of this warrant at maturity." This latter recital in the warrants was in conformity with the provisions of chapter 171, Laws 1929, that: "Whenever all special assessments collected for a specific improvement are insufficient to pay the special improvement warrants issued against such improvement with interest, the city council or city commission, as the case may be, shall upon the maturity of the last special improvement warrant, levy a tax upon all the taxable property in the city for the payment of such deficiency."

The contingency specified in the statute and in the recital in the warrants has come to pass—that is, all the special assessments collected for the specific improvement are insufficient to pay the special improvement warrants issued against such improvement and upon the maturity of the last special improvement warrant there is a deficiency in the fund into which the collections of the special assessments have been paid, and this proceeding is brought to compel the levy of a tax upon all the taxable property in the city for the payment of such deficiency. As I understand the opinion of the majority, it is predicated upon the premise that the contract and the statute which impose an obligation upon the city to levy such general taxes and the provision in the special assessment warrants pledging the faith and credit of the city to do so, are valid and enforceable, but, that not-

withstanding this, the city did not incur any indebtedness by issuing the warrants, within the purview of § 184 of the Constitution.

It is true warrants issued by a city pursuant to law for an improvement and payable solely out of special assessments upon property benefited by the improvement are not "debts" or "indebtedness" within the purview of the debt limiting provisions of the state Constitution. Vallelly v. Park Comrs. 16 N. D. 25, 111 N. W. 615. In such cases no debt is contracted or indebtedness incurred by the city to be paid by it.

"The debt is to be paid by the property benefited; that is, from the funds of the individuals, and not from the funds of the municipality. . . . The municipality acts merely as an assessing and collecting agent. A full performance of the obligation of the municipality under such a law involves it in no financial liability. The individual property owner who is benefited pays the debt. It is through a breach of its obligation, and not by a performance of it, that the municipality incurs a financial liability." State ex rel. University & School Lands v. McMillan, 12 N. D. 280, 303, 304, 96 N. W. 310, 318.

The indebtedness evidenced by the special assessment warrants in question here was not payable solely out of special assessments. The undertaking of the city, sought to be enforced here, was that if the special assessments did not produce sufficient moneys to pay the special assessment warrants in full, the city would pay the balance remaining out of its general revenues.

The right of action here is not predicated upon any breach of obligation of the city to properly assess and collect the special assessments and disburse the proceeds thereof to those entitled to receive them. It is predicated upon an alleged legal obligation, extraneous to the special assessments, which the city assumed when the warrants were issued,—an obligation different from, and in addition to, the obligations of the city incident to the assessment and collection of the special assessments, and the disbursement of the proceeds thereof. This obligation is not payable out of a special fund collected from individuals whose property has received correlative special benefits. It is payable out of general taxes to be imposed upon all taxpayers. In my opinion, the assumption by the city of this obligation constituted the in-

curring of an indebtedness.   Garrett v. Swanton, 216 Cal. 220, 229, 230, 13 P. (2d) 725, 729.

The majority construe said § 184 as applying only to a "debt" in the strict and technical sense of that word, and, hold that hence the section has no application to the "incurring" by a city of a contingent liability which may or may not ultimately become an *absolute* debt. In my opinion § 184 was intended to apply not only to "debts" in the strict and technical sense of that term, but to any and all "indebtedness" whether the same be absolute or contingent.   I believe it was the intention of the framers of the Constitution, and of the people who adopted it, to inhibit a city (and other political subdivisions of the state) from incurring any obligation that upon the happening of some future event would, without further act on the part of the city, become an absolute debt of the city.   It is to be noted that § 184 does not say that a city shall at or before the time it "contracts" a "debt" make the provision for the payment prescribed in such section.   It says that a city at or before the time of "incurring indebtedness" shall make such provision.   It is not to be supposed that the framers of the Constitution employed any words without occasion or deliberate intent, but rather that they "expressed themselves in careful and measured terms corresponding with the immense importance" of the rules they were formulating.   Cooley, Constitutional Limitations, 7th ed. p. 92.   In § 184, the framers of the Constitution used the words "incurring indebtedness."   It is rather significant that in the two preceding sections they employed the terms "contract" and "debt."   In § 182 of the Constitution they said: "The state may, to meet casual deficits or failure in the revenue, or in case of extraordinary emergencies, contract *debts*, . . . ."

In § 183 they said: "The *debt* of any . . . city . . . shall never exceed 5 per centum upon the assessed value of the taxable property therein; . . . ."

"The word *incur* is defined by Webster as 'to become liable or subject to; to render liable or subject to.'   Black—(Black, Law Dictionary, 2d ed.)—says: 'Men contract debts.   They incur liabilities. . . . *Incur* means something beyond contracts, something not embraced in the word *debt.*'   In Scott v. Tyler, 14 Barb. (N. Y.) 202,

*incur* is held to mean 'to become liable for.' In Flanagan v. Baltimore & O. R. Co. 83 Iowa 639, 50 N. W. 60:—'To become liable for.' . . . Hence it is apparent that the word *incurred* means more and embraces a different class of liabilities or obligations from those contracted." Bank of Indian Territory v. Eckles, 19 Okla. 159, 91 P. 695, 697.

Corpus Juris (31 C. J. p. 410) defines *incur* as meaning: "To assume, contract for, or become liable or subject to through one's own action; to become liable for or subject to; to bring on; to occasion or cause; to render liable or subject to; . . . ."

The word *indebtedness* is defined by Webster and by the New Standard Dictionary as, "The state of being indebted."

Corpus Juris (31 C. J. pp. 411–413) says: "Judicial definitions of the term *indebtedness* are numerous, and they must be read in connection with the facts out of which their necessity arose. Although the term has been said to have a fixed and well-understood meaning, it is a wide term of large meaning; and it must be construed in every case in accord with the context. . . . The term ordinarily may be defined as meaning the condition of owing money; the state of being by voluntary obligation, express or implied, under legal liability to pay in the present or at some future time for something already received, or for something yet to be furnished or rendered; the state of being indebted, . . . . *Indebtedness* is sometimes used in the sense of *debts.* However, *indebtedness* is of a wider and even less technical significance than *debt."*

While "debt" is a common-law term of technical meaning, and in this sense means "that for which an action of debt or indebitatus assumpsit will lie," it is used in different statutes and constitutions in a sense varying from a very restricted to a very general one. 17 C. J. 1371, 1372. It has been said that its meaning "in any particular statute or constitution is to be determined by construction, and decisions upon one statute or constitution often tend to confuse rather than aid· in ascertaining its signification in another relating to an entirely different subject." Note in 37 L.R.A.(N.S.) 1058. In the technical sense of the term, a sum payable upon a contingency is not a debt and·does not become a debt until the contingency has hap-

pened. Notwithstanding this, however, legal writers, courts and lawmakers frequently speak of "contingent debts." 13 C. J. p. 114; U. S. Rev. Stat. § 5068; Woodward v. Herbert, 24 Me. 358; 2 Collier, Bankruptcy, 13th ed. pp. 1372, 1418; 17 C. J. S. p. 183.

In interpreting the indebtedness limiting provisions of the Constitution, the object sought to be accomplished thereby should be kept in mind. The framers of the Constitution had the benefit of the experiences of other states. At the time our Constitution was framed, the history of many states afforded convincing evidence for the necessity of constitutional inhibition against unbridled expenditure by political subdivisions. Many counties and cities had become bankrupt through the extravagant management of their governing bodies, and in many instances such expenditures had been approved by the vote of the people. The framers of the Constitution had in mind the evil to which municipalities of other states had been subjected by the creation of obligations to be paid at some future date, especially where no adequate provision had been made for payment. The clear and unmistakable purpose of the framers of the Constitution of the state, by inserting the several sections in Article 12 of the Constitution, was effectually to protect the taxpayers, present as well as future, from abuse of the public credit and the consequent oppression of burdensome, if not ruinous, taxation. 37 L.R.A.(N.S.) 1060, 1061. By § 183 they put a definite limit upon the amount of debt that a city or other political subdivision may incur. That limit was predicated upon the assessed value of the taxable property therein. By § 184 they prohibited a city or other political subdivision from incurring any indebtedness whatsoever, unless at or before the time of so doing, provision were made, by an irrepealable law or ordinance, "for the collection of an annual tax sufficient to pay the interest and principal thereof when due." By the following section (§ 185) they prohibited the state and all political subdivisions thereof from loaning or giving their credit or making donations to or in aid of any individual, association or corporation, except for the necessary support of the poor. These several constitutional provisions "are mandatory and prohibitory" (N. D. Const. § 21), and must be so construed. They were intended not only to limit the powers of political subdivisions to contract debts or incur indebtedness; they were intended also to require

those who contract a debt or incur indebtedness to prepare for the day of payment so that when the debt or indebtedness falls due there will be funds available with which to make payment. They were intended to place it beyond the power of the Legislature to authorize or require cities or other political subdivisions to contract debts, or to incur or assume any indebtedness or any liabilities that later may ripen into debts, except to the extent and in the manner prescribed by such provisions.

If the framers of the Constitution had intended that § 184 should restrict only the power "to contract debts," but that it should not restrict the power of a governmental subdivision to assume a legal liability to pay a certain obligation that, upon the happening of some specified contingency, might become the absolute debt of such political subdivision at some future time, they would doubtless have used language that would have evidenced such intention. As pointed out, they used the terms "contract" and "debt" in the preceding sections. They did not use these terms in § 184, but used terms indicating an intention that the limitations of that section should extend beyond the contracting of debts; and that it was intended not only to forbid a political subdivision to contract debts, but to forbid it as well to take any action or assume any obligation that would render it liable to an indebtedness in any circumstances, either currently or at some future date,—except upon, or after, making provision, as prescribed by said § 184, for the payment of the interest and principal of such indebtedness when the same should become due.

It seems clear that the framers of the Constitution intended to make it impossible that a situation such as that which results from the enforcement of the liability against the city for the deficiency in the special improvement fund in this case should ever arise in this state. The special assessment warrants involved here were issued more than ten years ago. The obligation which it is sought to enforce is predicated alone upon the obligation that was assumed by the defendant city when the special assessment warrants were issued. The obligation of the city to pay the deficiency, and the duty of its officials to levy a general tax to provide the necessary funds for making such payment, are rooted in the special assessment warrants. The obligation of the city came into being when the warrants were issued. It was

then that the city assumed, and rendered itself liable for, any deficiency there might be in the fund against which the warrants were drawn "upon the maturity of the last special improvement warrant."

The happening of the contingency,—the existence of a deficiency in the fund against which the special warrants had been drawn at the time the last warrant matured,—did not constitute the "incurring" of an "indebtedness" by the city. That merely operated to mature and render enforceable the obligation the city had assumed when the warrants were issued. The "indebtedness" found to exist "upon the maturity of the last special improvement warrant" was not incurred when such warrant matured, it was incurred when the warrants were issued. The "state of being indebted" in which the city found itself did not result from any action on the part of the city or its officials interim the issuance of the warrants and the maturity of the last warrant. The "state of being indebted" for the amount of the deficiency in the special improvement fund, and the obligation of the city to pay such deficiency, came into being at the time of the issuance of the warrants, and existed solely as a result of their issuance.

"There is a clear and wide distinction between the creation of a liability and the accruing of a cause of action thereon, . . . A liability may be absolute or contingent; it may be unconditional or limited; it may be presently enforceable by action, or there may be time given for its performance; but, whatever its character, it is created by the consummation of the contract, act, or omission by which the liability is incurred." Hunt v. Ward, 99 Cal. 612, 615, 34 P. 335, 336, 37 Am. St. Rep. 87. See also First Nat. Bank v. Consolidated Lumber Co. 16 Cal. App. 267, 116 P. 680.

Here there was an existing indebtedness in the sum specified in the warrants, payable out of a special fund; and when the warrants were issued the city, under the recitals in the warrants and the provisions of the statute, agreed that if all the special assessments collected proved to be insufficient to pay the warrants, upon the maturity of the last warrant the city would levy a general tax to provide the necessary funds to pay whatever sum remained unpaid on such warrants. The liability was certain and definite; the time of performance was definite; the only matter of uncertainty was the amount that the city might ultimately be required to pay, and as to this a definite

measure was prescribed by which such amount should be computed.

The majority opinion makes reference to the decision of this court in Bismarck Water Supply Co. v. Bismarck, 23 N. D. 352, 137 N. W. 34. The facts in that case readily distinguish it from this case; and that decision is no authority for sustaining the validity of the stipulations in the warrants and the provisions of the statute involved here. The question there was whether a certain contract entered into pursuant to an ordinance of the city created an indebtedness in excess of the debt limit prescribed by § 183 of the Constitution. The city had granted a franchise to the Water Supply Company to establish, maintain and operate "a water system and waterworks" in the city; and to "lay and maintain water mains and pipes under any and all avenues, streets, alleys, public grounds and thoroughfares of said city, for the purpose of distributing water throughout the city to its patrons for the period of twenty years." The ordinance granting the franchise, also, provided: "In the event of a change of grade on any street or highway where the party of the second part shall have heretofore laid pipes or mains, the party of the first part shall reimburse the party of the second part in full for any expense that said party of the second part may be put to on account of such change of grade, either by way of lowering its pipes or mains to avoid the action of frost, or raising its pipes or mains or otherwise."

After the ordinance had been passed and become effective, the city and the Water Supply Company entered into a written contract as required by the ordinance, which contract, among others, contained stipulations, substantially in the language of the last quoted provision of the ordinance. Some years after the contract was made the city changed the grade on a street where the Water Supply Company had theretofore laid pipes and mains pursuant to its franchise, with the result that the mains and pipes theretofore laid were brought "too near to the surface to be below the frost line, and it became necessary for the Water Supply Company to lower and relay such mains and pipes, which it did." The city refused to pay the Water Supply Company for the moneys necessarily expended in lowering and relaying the mains and pipes, and thereupon the Water Supply Company brought suit against the city. In its answer the city, among others, asserted as a defense that the liabilities attempted to be assumed by

.the city under the ordinance and contract, "when added to the then existing indebtedness of such city, exceeded the constitutional debt limit, and that consequently such ordinance and contract to such extent were and are null and void." The cause was submitted in the trial court on the pleadings alone, and judgment was ordered for the plaintiff. On appeal, the contention was again advanced by the city that the obligations assumed by the city under the ordinance and contract created an indebtedness, and that by such ordinance and contract the city had incurred an indebtedness in excess of the constitutional debt limit fixed by § 183 of the Constitution. This contention was disposed of by this Court in the opinion in the case in the following language:

"Nor do we deem its contention sound, to the effect that by such contract the city incurred an indebtedness in excess of the constitutional debt limit. The presumption is in favor of the validity of the acts of the defendant's officers. Furthermore, the answer sets forth no sufficient facts as a basis for this attempted defense. No indebtedness was incurred by the ordinance and contract in question in so far as expenses such as those here sued for are concerned. As to this feature of the contract the defendant city merely incurred a contingent future liability." 23 N. D. 362, 137 N. W. 37.

In Bismarck Water Supply Co. v. Bismarck, supra, no obligation was incurred or assumed by the city to make any payment merely upon the happening of a contingency, and without any action on the part of the city or its officials. The only manner in which any liability could or would arise was by an affirmative action of the city changing a grade in such manner that the change operated to the injury of the property of the Water Supply Company employed by it in the operation of its business under its franchise.

It seems to me that the situation created by the application and enforcement of chapter 171, Laws 1929, in this case is one which the framers of the Constitution sought to provide against. I believe that when they said (§ 184) that a city shall not incur any indebtedness unless "at or before the time of so doing," it shall make provision "for the collection of an annual tax sufficient to pay the interest and also the principal thereof when due," they intended not merely to prohibit a city from contracting a debt unless it made such provi-

sion, but they intended as well to prohibit a city from assuming, or rendering itself liable or subject to, any legal liability, either absolute or contingent, to pay any indebtedness at some future time, unless before or at the time it assumed or rendered itself subject to such liability, provision were made for the payment of such indebtedness when the same became payable, as prescribed by the Constitution. In other words, I believe that it was the purpose and intent of § 184 of the Constitution to prohibit a city from placing itself in "a state of being indebted," either currently or at some future date, unless at or before the time the city made such commitment it made provision for the payment of such present or future indebtedness, when the same should become due, by the levy of the prescribed tax. It seems to me that any other construction ignores the objects sought to be accomplished by the Constitution, and makes it possible to bring upon the political subdivisions of the state, and their taxpayers, the very evils that the framers of the Constitution so earnestly sought to guard against.

The records of this court contain forceful proof that the obligation to pay a deficiency that may arise in a special assessment fund is not a mere shadowy or imaginary obligation. It is an obligation that may place upon a city an absolute financial obligation for a sum that may equal the whole amount of indebtedness that a city may contract. In fact, the deficiency may greatly exceed the constitutional debt limit. See Schieber v. Mohall, 66 N. D. 593, 268 N. W. 445. If a city may assume an obligation such as that which the city of Mandan assumed here, and such obligation be deemed nonexistent until it has become an absolute obligation to pay the deficiency found to exist in the special assessment fund upon the maturity of the last warrant, then a city that has no outstanding indebtedness today may tomorrow, upon the maturity of such last warrant, find itself in dire financial straits. A city that is without financial indebtedness today may tomorrow, upon the maturing of the last of a series of special assessment warrants issued twenty years ago for the construction of a sewer or a water main at that time (Comp. Laws 1913, § 3717; Laws 1923, chap. 288), or a similar warrant issued thirty years ago for the construction of a pavement at that time (Comp. Laws 1913 § 3719), find itself confronted with a deficiency in a special assessment fund

in an amount as large as, or even in excess of, the debt the Constitution says is the maximum the city may contract. It may find itself with its credit exhausted and unable to make expenditures for even emergency purposes because of obligations that were actually assumed twenty or thirty years ago, but for the payment of which no provision had been made, either before or at the time they were assumed, as § 184 of the Constitution prescribes.

In my opinion the agreement in the special assessment warrants to levy a tax upon all taxable property of the city to pay any deficiency in the special assessment fund against which the warrants were drawn, and the requirements of chapter 171, Laws 1929, that the governing board of the city shall levy such tax, run counter to the prohibition of § 184 of the Constitution of this state; and, hence, both the agreement and the statute are null and void and do not confer upon the holders of the warrants any right of action against the city.

I am authorized to say that Judge Burr agrees with the views expressed in this opinion.

BURR, Ch. J., concurs.