BANK OF INDIAN TERRITORY, a *Corporation*, v. JAMES R. ECKLES, as *County Treasurer of Comanche County, Oklahoma Territory.*

(Filed September 5, 1907.)

(91 Pac. 695.)

**COUNTIES—Powers—Incurring Debts—Kiowa-Comanche Country.** By the provisions of the act of congress approved March 3, 1901, (31 Stat. 1093) the board of county commissioners of Comanche county, Oklahoma, had no power or authority to allow any claim against the county revenues and issue a warrant prior to December 15, 1903, unless the contracting or incurring of such indebtedness was first authorized by the secretary of the interior.

(Syllabus by the Court.)

*Error from the District Court of Comanche County; before F. E. Gillette, Trial Judge.*

Affirmed.

*Stevens & Meyers,* for plaintiff in error.

*S. M. Cunningham,* for defendant in error .

Opinion of the court by

BURFORD, C. J.:  The Kiowa, Comanche, and Apache Indian country was opened to settlement on August 6, 1901, and Comanche county is composed of territory which originally was a portion of said Indian reservation.  The county government was organized immediately after the opening of said reservation to white settlement, and W. W. Painter was by the governor appointed and qualified as sheriff of said county, and proceeded to discharge the duties of said office until his successor was elected and qualified in January, 1903.  This proceding is for a peremptory writ of mandamus to compel the treasurer of said county to pay four several warrants issued by the board of county commissioners to Painter, and by him assigned to the plaintiff.  The petition for an alternative writ avers that on January 5, 1903, the board of county commissioners of Comanche county, Oklahoma, issued to

W. W. Painter warrant No. 64 for $10.40, warrant No. 65 for $1.15, warrant No. 46 for $985.80, and warrant No. 47 for $1,687.90; that there was at the time ample funds in each of the funds upon which said warrants were issued to pay all indebtedness against said funds, including these warrants; that the county treasurer refused to pay them; that the Bank of Indian Territory was the owner of each of said warrants by assignment from Painter for a valuable consideration; and it was asked that an alternative writ issue, directing the treasurer to pay said warrants from the funds in his hands or show cause why he refused. The county treasurer, by way of return to the alternative writ, admitted all the averments contained in the petition, but alleged that each of said wararnts was issued by the board of county commissioners without authority of law and in payment of claims for which Comanche county was not liable; that all of said warrants were for indebtedness incurred prior to the time for collecting county taxes in the calendar year next succeeding the opening, and that the incurring of said indebtedness had never been authorized by the secretary of the interior; that warrant No. 65, for $1.15, was issued to Painter for repairs on the county jail, furnished on October 24, 1902; that warrant No. 64, for $10.40, was issued for stamps bought and paid for by Painter as sheriff, between October 3, 1902, and October 31, 1902; that warrant No. 46, for $985.80, was issued to Painter for criminal work done by him as sheriff of said county from January 1, 1902, to March 31, 1902; that warrant No. 47, for $1,687.90, was issued to Painter for criminal work done by him as sheriff of said county during the quarter ending June 30, 1902; that said funds in the hands of the county treasurer were not liable for any of said indebtedness, but that the said indebtedness was payable, if at all, out of the funds derived from the sale of lots in the town of Lawton, which fund was in the hands of the secretary of the interior, and had never been in the hands of the county treasurer or subject to the order of the board of county commissioners; that there

was at that time in the hands of the secretary of the interior a sufficient balance of said town lots sale fund to pay all charges against the same, and to more than pay plaintiff's claims. To this return to the alternative writ the plaintiff filed a general denial. The alternative writ and the return constitute the pleadings in the case, and the reply should be treated as a demurrer to the return. The facts are admitted in the argument to be as alleged in the writ and return, and the court so found.

The facts presented call for the application and interpretation of the act of congress of March 3, 1901, 31 Stat. 1093, 1094, c. 846. This act provides for the reservation of lands in each county for a county seat, the manner of disposal of the town lots, and the disposition to be made of the funds arising from such sale. It may be stated generally that the power of congress to dispose of the public lands, as well as to legislate directly for the territories, is unquestioned. In any case, when congress legislates upon any subject over which it has jurisdiction, its laws supersede all laws upon the same subject and serving the same purposes enacted by any of its subordinate dependencies. The territory of Oklahoma possessed the legislative power to create county offices, to fix their compensation, and provide the manner of their payment. Congress possessed the same powers. Yet there could be no conflict of authority or of law. The superior includes the inferior. Its laws are paramount, and when the superior legislates and makes specific provision for the payment of county officers and provides the fund from which they are to be paid, the laws of the territory upon the same subject are suspended and inoperative, and the laws of congress must prevail. The portion of the act in question is as follows: "The receipts from the sale of these lots in the respective county seats shall, after deducting the expenses incident to the surveying, subdividing, platting and selling of the same, be disposed of under the direction of the secretary of the interior in the following manner: A court-house shall be erected therwith at such county seat at cost of not exceeding ten

thousand dollars, and the residue shall be applied to the construction of bridges, roads and such other public improvements as the secretary of the interior shall deem appropriate, *including the payment of all expenses actually necessary to the maintenance of the county government until the time for collecting county taxes in the calendar year next succeeding the time of the opening. No indebtedness of any character shall be contracted or incurred by any of said counties prior to the time for collecting county taxes in the calendar year next succeeding the opening, excepting where the same shall have been authorized by the secretary of the interior.*" ...In the interpretation of statutes, courts must find the meaning and intent in the language of the act itself, where there is no repugnancy or uncertainty. This statute seems clear. Congress knew what it wanted to accomplish, and said so; and we have no right to read into it some other purpose or meaning. Congress recognized the fact that under the laws of Oklahoma, which were then operative in these Indian reservations, county governments would be put in operation as soon as the country was opened to settlement, and by section 2 of the act it was provided: "The governor of the territory shall appoint and commission for each county all county and township officers made necessary by the laws of the territory of Oklahoma, who shall hold their respective offices until the officers elected by the people at the general election next following the opening shall have qualified." Congress knew that these officers so appointed would have to be paid, and the funds for the maintenance of a county government would have to be provided. By the laws of Oklahoma no taxes would be available for the payment of current expenses until December. of the next year following the opening. The country was opened in August after the time for the assessment of property for that year had elapsed. The first assessment that could be made under our laws would be in the spring of the following year, and the first installment of taxes from this assesment would be payable December 15, 1902, and until this date congress made provision for maintaining

county governments, and provided the funds and manner of their disbursement. In addition to providing a fund for the payment of all the necessary expenses incident to the maintenance and support of the county government during a given period, a prohibition was also imposed upon the counties. It was provided: "No indebtedness of any character shall be contracted or incurred by any of said counties prior to the time for collecting county taxes in the calendar year next succeeding the opening, excepting where the same shall have been authorized by the scretary of the interior." This was a wise and commendable act.

It has been suggested in the argument that this inhibition relates only to contractual obligations and does not affect imposed obligations or liabilities; that the salary of the sheriff was fixed by the laws of Oklahoma, and the law required him to be paid certain fees by the county, and that it was not the intention of congress to take from the counties the authority to pay this class of obligations. The language used by congress will not admit of this contention. The law says "contracted or incurred." The word "contracted" includes all of one class, and the word "incurred", to be given any meaning whatever, must be held to include another class. There are only two classes of county obligations, contractual and imposed, and evidently congress meant to include both classes. The word "incurred" is defined by Webster as "to become liable or subject to; to render liable or subject to." Black says: "Men contract debts; they incur liabilities. In the one case, they act affirmatively; in the other, the liability is incurred or cast upon them by operation of law. 'Incur' means something beyond contracts, something not embraced in the word ' debt' ". In *Scott v. Tyler,* 14 Barb. (N. Y.) 202, "incur" is held to mean "to become liable for." In *Flanagan v. Baltimore & Ohio R. Co.* (Iowa) 50 N. W. 60: "To become liable for." In *Beckman v. Van Dolsen,* 24 N. Y. Supp. 414: "To become liable for." In *Deyo v. Stewart,* 4 Denio (N. Y.) 101: "Brought on himself." In *Ashe v. Young,* 68 Tex. 123, 3 S. W. 454: "Brought on, occasioned, or

caused." Hence it is apparent that the word "incurred" means more and embraces a different class of liabilities or obligations from those contracted. It means the indebtedness imposed upon the county by salaries of county officers and other required and necessary expenses, all of which, to be a charge against the lot sale fund, must be authorized or approved by the secretary of the interior. To use a phrase somewhat familiar in these days, congress imposed "departmental government" upon these new counties until such time as the revenues from the taxes levied upon thier own property were available for their expenses; and until that time no indebtedness could be created by the county officers or imposed by the laws of Oklahoma until such time as the prohibition in the act of congress expired by limitation, when the laws of Oklahoma became operative, and the "embryo quarantine" was raised.

The services for which Painter filed his claim should have been presented to the secretary of the interior, and his authority obtained to incur the liability against the funds in his hands, and payment enforced against the special fund set apart for this special purpose. It was a part of the expense of maintaining the county government which is charged with the enforcement of the criminal laws and the prosecution of criminals. The return set up a complete defense to the allegations of the writ, and, being found true, the peremptory writ was properly refused.

The judgment of the district court is affirmed, at the costs of the plaintiff in error.

Gillette, J., who presided in the court below, not sitting; Irwin, J., absent; all the other Justices concurring.