THE RARITAN COMPANY OF DELAWARE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

THE MIDDLESEX COMPANY OF DELAWARE, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 106869, 106870, 108554, 108555. Promulgated October 8, 1942.

*Paul F. Myers, Esq.,* and *Martin W. Meyer, Esq.,* for the petitioners.
*Charles Oliphant, Esq.,* for the respondent.

### OPINION.

MELLOTT: These proceedings, duly consolidated for hearing, involve deficiencies in personal holding company surtax as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Raritan Co | 106870 | 1937 | $1,105.48 |
| | 108555 | 1938 | 975.00 |
| | do | 1939 | 151,355.95 |
| Middlesex Co | 106869 | 1937 | 1,200.28 |
| | 108554 | 1938 | 975.00 |
| | do | 1939 | 148,718.98 |

The entire amount of each deficiency is in controversy.

Docket Nos. 106870 and 108555 (Raritan Co.) arise out of the same basic facts. Docket Nos. 106869 and 108554 (Middlesex Co.) arise out of a partly separate but wholly parallel set of facts which, except for details as to names, dates, amounts, etc., are substantially identical with those in Docket Nos. 106870 and 108555. The facts are found to be as stipulated.

The sole issue in each proceeding is whether payments made in 1937, 1938, and 1939 under the circumstances hereinafter related are deductible under the provisions of section 355 of the Revenue Act of 1936, as amended, section 405 of the Revenue Act of 1938, and section 504 of the Internal Revenue Code, which were in effect for the years 1937, 1938, and 1939, respectively, and provided in identical terms for the following additional deduction in computing the net income subject to the personal holding company surtax:

"(b) Amounts used or irrevocably set aside to pay or to retire indebtedness of any kind incurred prior to January 1, 1934 * * *."

The facts hereinafter set out are taken principally from the stipulation filed in the first mentioned proceeding, involving the Raritan Co.

Petitioners are corporations organized under the laws of Delaware. Each has its principal office in New Brunswick, New Jersey, and each filed personal holding company returns, for the three taxable years in issue, with the collector of internal revenue at Newark, New Jersey. The notices of deficiency were mailed in Docket Nos. 106869 and 106870 on January 17, 1941, and in the other proceedings on June 18, 1941.

Johnson & Johnson, a corporation organized under the laws of New Jersey, is a large and internationally known manufacturer of medical, surgical, and hospital supplies which for many years has directly or through subsidiaries operated plants in New Hampshire, Massachusetts, New Jersey, Illinois, and Georgia, in England, Australia, Canada, South Africa, Northern Ireland, and other parts of the British Empire. Since 1927 it has been actively controlled and managed by Robert Wood Johnson and J. Seward Johnson, who are now chairman of the board and vice president, respectively, and who acquired their control in the manner hereinafter described.

Johnson & Johnson was founded as a partnership in 1886 and incorporated in 1887 by the father of Robert Wood and J. Seward and his brother, James W. Johnson. The father of the two boys died in 1910. In 1927, when the two sons of the deceased co-founder together held slightly less than one-half of the common stock (which is the only stock which has ever had voting power), certain differences with respect to management policies arose between them and James W. Johnson, the surviving co-founder. The latter thereupon agreed to sell part of his common stock to each of his nephews so that they would then jointly own substantial control of the business.

Under the above agreement J. Seward Johnson in 1927 purchased from his uncle 1,667 shares of common stock of Johnson & Johnson, paying therefor in cash $541,710, which amount he in turn borrowed from the Chase National Bank of New York City. Through a stock dividend in 1931 this block of stock was increased to 4,167 shares.

Five years having passed with no reduction in the loan, a plan was formulated in 1932 whereby all, or most, of the substantial dividends regularly paid on Johnson & Johnson stock could be made available, and they were in fact used, to curtail the bank loan, with the result that by 1939 the loan had been entirely liquidated by funds thus derived from Johnson & Johnson dividends.

The plan called for the organization of a series of two corporations on the theory that if one held the stock of the other the latter would not be subject to any tax under section 104 of the Revenue Act of 1928 or corresponding provisions of subsequent acts. Thus on or about March 31, 1932, the petitioner "The Raritan Company of Delaware,

Inc." (hereinafter referred to as Delaware) was organized under the laws of that state and its entire capital stock of 500 shares was issued to J. Seward Johnson in exchange for 30,000 shares of the common stock of Johnson & Johnson. Shortly thereafter there was organized under the laws of Newfoundland "The Raritan Company, Limited" (hereinafter referred to as Newfoundland), and it acquired from Delaware the aforesaid 30,000 shares of common stock of Johnson & Johnson in exchange for all but three shares of its own common stock. The reasons which led to the selection of Newfoundland for the incorporation of the second corporation were the large interests of Johnson & Johnson throughout the British Empire and confidence in the economic stability of that Empire as well as the tax saving.

At about the same time Newfoundland purchased from J. Seward Johnson an additional 4,167 shares of common stock of Johnson & Johnson, paying therefor in cash $541,710, with which he in turn paid off the entire amount of his loan at the Chase National Bank. This was the same block of stock which he had bought in 1927 from his uncle at the same price. In order to make this purchase Newfoundland borrowed from the Chase National Bank $541,710. This indebtedness was evidenced by Newfoundland's interest-bearing demand note for that amount dated May 19, 1932, which was at all times amply secured by collateral. A true copy of this note is incorporated in the stipulation of the parties. It was retained by the bank as evidence of the indebtedness until the final payment in 1939 of the balance then due thereon in the amount of $203,500, at which time it was surrendered to Delaware.

The following notations were made on the note from time to time by the bank in due course of business to record the intervening payments on account of reduction of principal:

| Date | Paid | Balance | Date | Paid | Balance |
|---|---|---|---|---|---|
| 7/26/32 | $30,000 | | 2/24/36 | $25,000 | $300,000 |
| 4/6/33 | 13,710 | | 8/7/36 | 30,000 | 270,000 |
| 3/3/34 | 75,000 | | 12/10/36 | 40,000 | 230,000 |
| 9/13/34 | 55,000 | $368,000 | 3/2/37 | 25,000 | 205,000 |
| 11/9/35 | 43,000 | 325,000 | 12/21/38 | 1,500 | 203,500 |

The payments from 7/26/32 to 12/10/36, inclusive, were made by Newfoundland, but the payments on 3/2/37 and 12/31/38 and the above mentioned final payment in 1939 were made by Delaware under the circumstances hereinafter set out.

In December of 1936 Newfoundland was completely liquidated and dissolved in accordance with the provisions of section 112 (b) (6) of the Revenue Act of 1936 and with the prior consent of the Commissioner of Internal Revenue, formally granted under section 112 (i) of the Revenue Act of 1936, that the exchange thereby effected was

not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

The liquidator of Newfoundland transferred to Delaware as sole stockholder (outside of the three qualifying shares which were liquidated by the payment of $20 each, being the same amount which had been paid in for such shares) all of the assets of Newfoundland, subject to the indebtedness on the note at the Chase National Bank, which at that time had been reduced to $230,000. The assets so transferred consisted solely of Johnson & Johnson common stock and a small amount of cash, which assets thereupon became the sole assets of Delaware.

It has been stipulated that the final decision on the above facts in Docket No. 106870 shall be controlling with respect to the corresponding issues in Docket Nos. 106869, 108554, and 108555. The petitioner corporation in Docket Nos. 106869 and 108554 was the counterpart of Delaware with respect to a similar sequence of facts arising out of a similar purchase of Johnson & Johnson stock in 1927 by Robert Wood Johnson.

Respondent determined that no credit could be allowed to the Delaware corporations since the payments made by them ·were on indebtedness assumed upon the liquidation of the Newfoundland companies on or about December 31, 1936; in other words, that the amounts were not "set aside to pay or to retire indebtedness * * * incurred prior to January 1, 1934 * * *."

Petitioner contends (and hereinafter reference will be made only to Raritan, the Delaware corporation) that *Sun Pipe Line Co.* v. *Commissioner*, 126 Fed. (2d) 888, affirming *Sun Pipe Line Co.*, 42 B. T. A. 1413, and *Piermont Corporation*, 43 B. T. A. 770, are controlling and require that the claimed deduction be allowed. It argues that the same conclusion is also justified upon other grounds, which will be stated more fully by us later in connection with the consideration of them.

In the *Sun Pipe Line Co.* case the taxpayer had issued, in 1930, bonds aggregating three and a half million dollars. Subsequent to January 1, 1934, it retired these bonds with the proceeds of a larger issue, the new bonds being sold to parties other than the holders of the first mentioned bonds. In the taxable year it redeemed the bonds last issued and deducted the amount under the statute applicable here. In the *Piermont Corporation* case the taxpayer, being indebted prior to January 1, 1934, to a bank, thereafter replaced the obligation with twenty-year debentures. At the end of the year 1934 and again at the end of the year 1935, $50,000 was set aside in a sinking fund for the retirement of the bonds and these amounts were deducted under the same statute. The Board concluded in each case that the taxpayer was entitled to the claimed deduction and the court affirmed. The essence of the Com-

missioner's theory under which the claimed deductions had been disallowed was that the personalities of the obligees had changed. We deemed that to be immaterial. The court agreed that this was so, pointing out that "* * * it is the contract, not the parties who are bound by it, that matters. The term [indebtedness] has been defined as an obligation to pay or perform * * * and is synonymous with owing. * * * Nowhere do the cases stress to whom." Petitioner construes the first portion of the quotation as implying that it is equally unimportant *by* whom the indebtedness is owing; but manifestly such construction is erroneous. The cited cases are therefore not determinative of the present controversy.

Petitioner argues that in the instant proceeding there was a mere "technical" change whereby it, on dissolution of its wholly owned subsidiary, "was found to be standing in the shoes of the subsidiary"; that the equity in the subsidiary's assets to which it succeeded was not substantially different from the equity which it had before the dissolution; that a substantial part of the subsidiary's assets was posted as collateral for, and thus doubly subject to, the indebtedness; that through its control of the subsidiary petitioner could have redeemed or obtained possession of the collateral just as easily before as after the dissolution; and that there was no actual change of any sort, after January 1, 1934, "other than in the technical respect just noted."

At the threshold petitioner is confronted with an extant opinion of this Board holding directly contrary to its present contention. In *Samuel Goldwyn, Inc., Ltd.*, 43 B. T. A. 1086, 1089, it was said:

* * * The concept of indebtedness is inextricably associated with a particular obligor—an obligor that here must occupy such legal status prior to a certain date. * * * We think the conclusion inescapable from the statutory language that the indebtedness must have been incurred prior to January 1, 1934, by the *taxpayer*, i. e., the personal holding company. The statutory language and the use of a critical date would otherwise be devoid of meaning. * * *

Petitioner, pointing out that under the facts in the cited case the taxpayer was not in existence at the time the indebtedness was created and that the notes upon which the payments were made had not even been issued prior to the taxpayer's incorporation on May 18, 1934, argues that the above language is mere *dicta* and should not be considered controlling in the instant proceeding. It also requests that the paragraph be reconsidered "because the thoughts there expressed are much too broadly stated even as *dicta*." In that connection it points out that a *secured* debt, e. g., might continue for years if the interest is paid and that one who pays the debt for the purpose of relieving his property of the lien against it is not necessarily a debtor. The question has been reconsidered and, whether it was necessary or

not that all of the quoted language be used in the cited case, the Board is of the opinion that it correctly enunciates the principle which must be applied in the instant proceeding.[1] Therefore, unless the indebtedness in issue was "incurred" by petitioner prior to January 1, 1934, it is not entitled to the claimed deduction. This brings us, then, to the other contentions made by petitioner.

It is true that under the reorganization provisions of the revenue act petitioner, owning all of the stock of its subsidiary, could at any time take to itself as a distribution in complete liquidation, all of its subsidiary's property without making itself liable for tax. It is also true that the basis for determining gain or loss upon a subsequent sale would be the basis in the hands of the subsidiary. (Sec. 113 (a) (15), Revenue Act of 1936.) It does not follow, however, as petitioner contends, that, from the standpoint of the revenue acts, petitioner is to be considered as owning at all times an "equity in the collateral [owned by the subsidiary] which secured the indebtedness here in question." Petitioner refrains from suggesting that the corporate entity of the Newfoundland corporation should be ignored; and it is obvious that as much reason exists for ignoring both corporate entities as for ignoring one. "A taxpayer is free to adopt such organization of his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages." *Higgins* v. *Smith*, 308 U. S. 473. Nor is it particularly important whether the corporation was set up for the purpose of avoiding tax or that respondent, in earlier years, may have endeavored to apply section 102 or 104 on the theory that a corporation had been "formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders." Cf. *Mead Corporation* v. *Commissioner*, 116 Fed. (2d) 187. The fact remains that petitioner and its sole stockholder selected the method of doing business and apparently deliberately chose to have petitioner's subsidiary, rather than it, incur the indebtedness. Having done so, the burdens as well as the benefits must be accepted.

Petitioner, citing *Bank of Indian Territory* v. *Eckles*, 19 Okla. 159; 91 Pac. 695, in which the words "contracted" and "incurred" are distinguished, contends that the latter, as used in the statute now under consideration, merely means that the indebtedness must have been "brought on," "occasioned," or "caused" prior to January 1, 1934. It argues, therefore, that the clause "indebtedness incurred prior to January 1, 1934," should not be limited by construction so as to "apply only where it was a particular corporation or taxpayer that technically

---

[1] Art. 351–4. Regulations 94, as amended by T. D. 4777, 1937–2 C. B. 197; art. 405–2, Regulations 101, and sec. 19.504–2, Regulations 103, provide that "The indebtedness must have been incurred (or, if incurred by assumption, assumed) by the taxpayer prior to January 1, 1934, * * *.

entered into a certain contractual obligation prior to that date." We do not agree. The word "incurred," as the court points out in the cited case, "is defined as to become liable or subject to; to render liable or subject to." Petitioner, under the presently stipulated facts, did not "become liable or subject to" the indebtedness until December, 1936. It apparently recognized that this was so; for in the resolution which it adopted for the liquidation of its subsidiary it was stated:

That all of the other property [except the $60 paid in cash in redemption of the 3 shares of stock] * * * be set over in kind to * * * [petitioner] subject to the payment of all indebtedness due and owing by * * * [Newfoundland] which * * * [petitioner] assumes and agrees to pay, in complete cancellation and redemption of the said 497 shares held by it.

The liquidator assigned the Johnson & Johnson shares to petitioner, referring to the fact that they were deposited "with the Chase National Bank * * * as collateral security for the payment of a promissory note dated May 19, 1932—on which there is now due the sum of * * * $230,000 and accrued interest which * * * [petitioner] hereby assumes and agrees to pay * * *." When this occurred, and not before, the indebtedness was "incurred" by petitioner.

Other suggestions urged upon us by petitioner are not wholly unsound, but seem to be more or less immaterial. It is no doubt true that the selection of Newfoundland for the incorporation of one of the links in the corporate chain was dictated by business reasons and, as the parties have stipulated, because of "confidence in the economic stability of the [British] Empire." There is also no reason to apply the rationale of *Gregory* v. *Helvering*, 293 U. S. 465, or to hold that there was a complete novation. Whether petitioner had, or had not, entered into a contract with the bank, specifically assuming and agreeing to pay the note, is likewise without significance here.

As stated at the outset, our question is whether the indebtedness was incurred by Raritan, the Delaware corporation, prior to January 1, 1934. It is apparent we have concluded this question must be answered in the negative. This disposes of the only issue and requires a holding, which is now made, that the respondent committed no error in determining the deficiency in Docket No. 106870. It follows that the deficiencies in the other proceedings must also be sustained.

*Decision will be entered for the respondent in each of the four proceedings.*